ARONSON, (HOFFMAN v.) See Case No. 6,576.

A. ROSSITER, The, (WARD v.) See Case No. 17,147.

ARREDONDO, (WARD v.) See Case No. 17,148.

ARROW, The, (BUTLER v.) See Case No. 2,237.

## Case No. 563.

### ARROWSMITH v. BURLINGIM.

[4 McLean, 489;[1] 1 Amer. Law J. (N. S.) 448.]

Circuit Court, D. Illinois. Dec. Term, 1848.

EJECTMENT—COLOR OF TITLE—EVIDENCE—LIMITATIONS—CONSTITUTIONAL LAW.

1. Under the limitation law of Illinois of 1835, two things are necessary to the defense: first, possession, and second, a connected title in law or equity deducible of record, etc. Possession without title counts for nothing. The party in possession must have held under title for seven years next preceding the action brought.

2. To render an auditor's deed evidence of title to land sold for taxes under the law of 1827, it must be first shown that the requisitions of the law have been complied with.

3. The statute of Illinois of 1838–39, "to quiet possession and conform titles to land," is not a limitation law. It is a legislative conveyance and adjudication of one man's land to another, and therefore unconstitutional.

4. Color of title in good faith must be such a title as would pass the land of itself, if a better title be not shown; if it do not amount to that, but is on its face bad, the tenant can not be said to take possession in good faith.

5. The belief of a tenant that his title is good must be a legal and intelligent belief, and can only be arrived at by an inspection of his title. If the court, on such inspection, pronounce it a connected title in law or equity deducible of record, etc., the tenant having been seven years in possession, would be protected under the limitation law of 1835. The same would arise where the occupant held under "claim and color of title made in good faith."

[1] [Reported by Hon. John McLean, Circuit Justice.]

Williams & Lawrence, for plaintiff.
Browning & Bushnell, for defendant.

POPE, District Judge. The plaintiff showed title derived from the United States, and possession of the premises by the defendant. The defendant shows a connected title from the auditor of Illinois upon a sale of the land for taxes in 1829, under the law of 1827. The deed bears date in 1831. The sale was to Cavarly, who sold the premises to —— in 1834, and gave a quit-claim deed reciting that he held under a deed from the auditor upon a sale for taxes. His grantee conveyed by quit-claim deed in 1840, the premises to —— under whom the defendant claims. No proof is offered that the auditor complied with the requisitions of the law in making the sale for taxes, beyond what the deed itself imports. He has also proved seven years' residence on the land next preceding the bringing of the suit, and that he has paid the taxes assessed during that time.

The defendant relies, 1st. On the statute of limitations of 1835, [Act Ill. Jan. 17, 1835, § 2.] 2d. On the act of 1838–9, entitled "An act to quiet possessions and confirm titles to land," [Rev. St. Ill. 1845, c. 24, § 8.]

The plaintiff contends, 1st. That the defendant has not shown the title required by the act of 1835, in this: that the auditor's deed conveys no title, unless supported by proof of his compliance with the law under which he sold; 2d. That the act of 1838–39 is unconstitutional in this: that it conveys one man's land to another, acting upon the right, not upon the remedy; 3d. That he has not shown claim and color of title in good faith, as required by the law of 1838–39.

The vast amount of property depending upon the principles involved in this case, gives to it unusual importance. It has therefore been argued on both sides with consummate ability and learning. Feeling appeals were made to the sympathies of the court in favor of settlers and in favor of laws of repose. It is only necessary to take a cursory view of the land titles in Illinois to show how little occasion there is for those appeals. The United States was the great land holder. Before it proceeded to sell, it caused the land to be surveyed into quarter sections, numbered by town, range and section. It sold under great precautions against selling the same tract twice; in truth it very rarely happened; so that the patent was for a determinate and surveyed piece of land. Here was simplicity and no confusion. One wishing to own the same tract could ascertain, by application at the proper land office, if it was sold, and to whom. It is true that the patentee or some one holding under him, might sell twice. In such case, the junior purchaser in good faith would be a fit subject for the protection of the statute of limitations. Can this be predicated of him who sets up a claim

based upon a deed from a man, or officer, who proposes to convey the property of another? I think not. The case was quite different in Kentucky and Tennessee, and in a part of Ohio. Virginia and North Carolina sold and granted their land in Kentucky and Tennessee upon private surveys, and described the land in the patent as directed by the patentee, not knowing that some other may not have obtained a patent for the whole or part of the land. Hence there were instances where the same land was covered by several patents. Hence arose endless litigation, and it became the duty of the legislative department to strain its power to the utmost to afford relief to the settlers. They indeed had claim and color of title in good faith. It was the duty of the courts to give full effect to the benevolent policy of the legislature. It is far otherwise in this state. Here, a man takes possession of another's land, lending himself to the unconscionable purpose of depriving him of his acres for cents. This case had been argued for the defendant as if the military tract were alone interested, forgetting that it is a very small part of the state of Illinois, and that land has been sold for taxes all over the state

The first point of defense, viz: the law of 1835, will be considered. The law provides that every "real, etc., action brought for the recovery of land which any person may be possessed of by actual residence, having a connected title in law or equity deducible of record from this state or the United States, or from any public officer or other person authorized by the laws of the state to sell such land for the non-payment of taxes; or from any sheriff. marshal or other person authorized to sell such land on execution, or under any order, judgment or decree of any court of record, shall be brought within seven years next after possession taken. But, when the possessor shall acquire title after taking such possession, the limitation shall begin to run from the time of acquiring title." The most striking and peculiar feature in this law is that no length of possession without title will protect the occupant. He must have held under title for seven years next preceding the action brought. So, possession without title counts for nothing. Two things are necessary to the defense. First, possession; second, a connected title in law or equity deducible of record, etc.

The first the defendant has shown. Second, has he shown a title as required by law? He relies upon the deed from the auditor. This court is relieved from the construction of the law under which the deed was made, as it has already received a construction by the supreme court of Illinois, in 1837, in the case of Garrett v. Wiggins, reported in 1 Scam. 343. The court there declares, "it is a settled principle of the common law that a party claiming under

a summary and extraordinary proceeding, must show that all the indispensable preliminaries to a valid title which the law has prescribed in order to give notice to those interested and to guard against fraud, have been complied with, or the conveyance to him will pass no title." The court classed the giving notice of the sale among the "indispensable requisites." The authority of the auditor to sell is limited to the lands advertised. "Without proof of this fact, the auditor's deed was not evidence of the regularity of the sale, and consequently conveyed no title to the purchaser." In these remarks of the court, this court fully concurs. The case arose under the law of 1827, and the auditor's deed is for land sold for taxes under that law; so is the case at bar. It is, therefore, a decision of the point now controverted. But it is said that the case of Garrett v. Wiggins, is not in point, because in that case the plaintiff produced the auditor's deed in support of his action of ejectment. In the case at bar, the defendant produces the auditor's deed to protect his possession. In the former case, it was necessary for the plaintiff to make out a good title. In the case at bar, it is only necessary that the defendant should show an appearance of title to protect his possession. It is sufficient answer to say, that the supreme court of Illinois made no such qualification, but declared in terms that the deed conveyed no title. But the act of limitations requires a title. How, then, can it be satisfied with an instrument that conveys no title at all? The case of Skyle's Heirs v. King's Heirs, throws much light upon the subject. It is a decision of the court of appeals of Kentucky, reported in 2 A. K. Marsh. 384. In that case, the defendant in possession showed a connected chain of title under a junior patent from the commonwealth. The court held, that it would protect him, because it would hold the land upon its face when tried by itself. The state was the great landholder. It gave two grants; the younger would hold if the older were not produced. So he has title deducible of record, etc. But it is far different with the case at bar. The auditor does not profess to sell his own land or have any interest in it. His power is, therefore, a naked power. It must appear that he has exercised it in the prescribed manner. This has not been attempted to be shown in this case. For these reasons the defendant has no title, and is therefore not protected by the statute of limitations of 1835.

Is the defendant protected by the statute of 1838–39, "to quiet possession and confirm titles to land?" The defendant contends that it is in effect a limitation law. If not, that it is within the competency of the legislature to act upon the right in this matter so as to divest it. So much of the act as is material to this controversy, is as follows, viz: "Every person in the actual

possession of lands and tenements under claim and color of title made in good faith, and who shall for seven successive years continue in such possession. and shall also during said time pay all taxes legally assessed on such lands and tenements, shall be held and adjudged to be the legal owner of said lands and tenements to the extent and according to the purport of his or her paper title." Is it a limitation law? It does not profess to be one either in its title or body. But it is said at the bar, that limitation laws have their origin as to real actions on the assumption of abandonment. No adjudged case or dictum in support of it has been shown, and none is believed to exist; but abundant authorities can be shown to the contrary. See Bl. Comm. 188, and following pages. That position, then, is dismissed with the remark, that it is more ingenious than solid. It is, then, a legislative conveyance and adjudication of one man's land to another. The land passes against all the world not enumerated in the saving clauses. The divestiture is declared to depend upon the act of another, not for any fault or omission or commission in the true owner, who is not required to improve the land nor to pay the taxes; and if he did pay the taxes regularly, it would not save his property. Can legislatures in this enlightened age, with written constitutions to restrain them, take from one and give to another his property with or without compensation? It is only necessary to state the proposition in its nakedness to meet refutation.

The owner has disregarded no regulation nor violated any law. Has he received any benefit from the occupant for acts done without his request? The occupant has paid the taxes which might benefit the owner if he had not paid them himself; but as they were paid without request, no action would lie against him for reimbursement. But he has improved and cultivated a portion of the land. (In the case at the bar, it is not shown how much, nor that any lasting improvements were made, nor is it necessary under this law.) But he has made improvements. Did they cost much? Probably not, in this prairie country. Was the owner benefitted? It is safe to presume not, if the improved land was prairie. If timber, it would be worse. The scarcity is such that great economy should be observed in its preservation. Most probably the owner was injured. Hence, the occupant can have no legal or moral claim for benefits conferred by his labor. It was different in Kentucky and Tennessee. The lands there were covered with timber, and required great labor and long time to open a farm. This awakened the sympathy of their legislatures for the occupant. But in Illinois the farms are already open, with scarcely sufficient timber for building, fuel and fencing. So, sympathy is misplaced when invoked in behalf of occu-

pants in Illinois. But the great question must be met fearlessly, but with a profound sense of the responsibility incurred by a judge, when he interposes the aegis of the law in defense of a citizen whose property is divested by a legislative act, which imputes to him no blame, and holds out to him no recompense for his loss. This act requires of him nothing, nor does it hold out threats of forfeiture for the doing or not doing any thing, but gives his property to another in terms on specified conditions.

Is it within its constitutional powers? A slight glance at the construction of society may be not without profit in the solution of the problem. Man was sent into the world by his Maker to seek his happiness: furnished with a code of laws, enacted by an all-wise and benevolent God, implanted in his heart. Although those laws were perverted by imperfect man, their perfect beauty and adaptation to the moral government of the world is in a constant course of development as Christianity, civilization and true knowledge advances. His rights and obligations had and have their existence in that law. But man's happiness was insecure in his insulated condition. He was inspired with social tastes. The social state promised increased happiness in the security it would afford to his person and property. Hence, the social compact. In this compact it was agreed that man should surrender as many of his natural rights as was deemed conducive to the general good, and received in return the engagement of the society to protect him in his person and property. And for the surrender of the natural right to take redress for wrongs in his own hands, the society agreed to afford him suitable remedies for the injuries he might be exposed to. These obligations imposed upon the society the duty to establish a government; a legislature, to prescribe rules of conduct; a judiciary to expound them; and an executive, to enforce them.

It would be unprofitable to give here an exposition of the origin and progressive changes in the titles to real estate in England. It is sufficient to say, that, until the latter part of the seventeenth century, they differed widely from ours. With us the tenure is free and common socage; the tenure of a freeman. And a freeman may buy and sell at his pleasure. This right is not of society, but from nature. He never gave it up. It would be amusing to see a man hunting through our law books for authority to buy or sell, or to make a bargain. The search would be vain. Society indeed may prohibit the making contracts injurious to the common good. This is a salutary restraint upon his natural right. No grant is needed. Rights are from nature. Titles and remedies are the invention of society. The latter are changeable at the will of the legislative department. Remedies may be granted or withheld; and as the

legislature has none over it, there is none to control it. But the former—rights—are sacred, and can not be invaded but by up-turning the first principles of society; without violating the great, nay the only object and conditions of the social compact. Magna Charta only asserted first principles. So the articles of the constitution of this and other states are only recognitions of those principles that uphold all free governments; the violation of which would dissolve the obligations of obedience.

In this enlightened age no government dare do it, without incurring a moral responsibility that no man will dare encounter. The omnipotent parliament of Great Britain dare not.

This act is so fraught with disaster to the country in the insecurity of property, etc., that this court must assume that the legislature was not aware of a tithe of the evils they were entailing on the country if this law were sustained. The principles embraced and put forward in the law are at war with freedom. For the man is a slave whose property is unsafe. This act presents a strong anomaly. If the plaintiff had committed a crime causing forfeiture, his property could not be taken from him but upon a judicial decision; but for no imputed fault it is taken from him by this act without a trial. Hence, in the argument, the defendant's counsel earnestly repelled the idea of forfeiture in this case. The United States sold their lands for a full price, and gave a grant in fee simple unconditionally. It is under a grant of this kind that the plaintiff claims. In case of actual settlers, full payment of the land must be made, and all the favor they have is in the right of preemption. In this case the state of Illinois gives without price that which is not hers, but a citizen's. "No person shall be disseized of his freehold, etc., unless by the judgment of his peers or the law of the land." This is only declaratory of first principles. The only value of it is to restrict the government to a particular mode of divesting the title. "The judgment of his peers or the law of the land." The authorities agree that this must be done through the courts.

This law of 1838–39, has been considered thus far as if the defendant rested his defense alone upon seven years' possession, and payment of taxes assessed. But he has an additional reliance. It is insisted that he has shown claim and color of title made in good faith. Connecting the latter part of the sentence with the first, it appears that the legislature intended a paper title; as it conveys to him all the land to the extent and according to "the purport of his paper title." This is an important point in the case, and so thought the defendant's counsel, who directed to it very great exertions with an ability rarely equalled. They insisted with great earnestness that the title shown by

the defendant was "claim and color of title made in good faith," contemplated by the law; that it appeared fair on its face; that the auditor's deed was in the form prescribed, and therefore the occupant was warranted in indulging the honest belief that the title was good. But if in fact bad, still that it was sufficient to protect his possession.

In England. title in ejectment, where the defendant shows possession, made no figure but to prove that he was not a wrong doer, and that his possession was adverse. Hence in England and America, under the twenty years' possession, a mere pretence of title might be deemed sufficient to show that the entry was not a trespass, and that he held adversely to the true owner. In such case, there is great force in the argument that it is enough that the occupant believed his title good. In that case, it is the possession that is the principal; the title only explanatory. The statute of Illinois makes the title the principal, the possession only auxiliary. The English decision must be understood to have reference to a different law from the law of Illinois. At the bar, the deed of the auditor has been likened to the grant from the United States or from the state. The difference, however, is manifest. The United States and the state are sovereigns, and every act of a sovereign has all presumptions to sustain it; not so the acts of the auditor. The United States or the state profess to convey their own land; the auditor, the land of another. He, then, stands on no better ground than the sheriff, who is bound to show his authority. The auditor does not profess to be the great land holder, but only to exercise control over another man's property under authority conferred by law; and does not show that he acted in conformity to the authority conferred. Nor has it been proved. See Garrett v. Wiggins, 1 Scam. 343; Thatcher v. Powell, 6 Wheat. [19 U. S.] 119; Walker v. Turner, 9 Wheat. [22 U. S.] 541; Williams v. Peyton's Lessee, 4 Wheat. [17 U. S.] 77. All these cases concur in saying, that unless it appear that the officer or agent pursued his authority, the proceedings are void. (I here take occasion to say that I do not adopt the doctrine intimated by the court in the case of Garrett v. Wiggins, that the legislature has the power to establish such rules of evidence as will compel the courts to receive the acts of agents as proof, either prima facie or conclusive, that they have executed their duties correctly. But that case is not before the court. The remark is made now only to repel the inference that I acquiesced in that doctrine.) It is not surprising that the defendant's counsel failed to furnish the court with an English definition of "claim and color of title," for the reason given above. But the supreme court of New York has defined it in the case of Jackson v. Frost, 5 Cow. 351. The court says it must be, as "I understand the law, such a title as the law will prima facie consider a

good title; otherwise there would be no uniformity." But in Illinois it must be a paper title, and that title must have the appearance of a good title. The consequences which might flow from the doctrine contended for by the defendant's counsel are truly startling. Suppose the defendant's deed had covered the whole of Adams county. Several years' possession of a very small piece would give him all the unoccupied land in the county, if he be released from the obligation of looking into his grantor's title. As the case at bar now stands, the auditor's deed is void, and conveys no title.

Color of title in good faith must be such a title as would pass the land of itself if a better title be not shown; for if it do not amount to that, but is on its face bad, the tenant can not be said to take possession in good faith. For example: If A conveys to B land avowedly the property of C, it is a fraud in B to take the conveyance. If A professes to act by authority from C, or in any other manner, the authority must appear, or, in its absence, it is the duty of B to inquire. The fact of its being confessedly the property of C, is notice to B; and if he neglect to inquire, but accepts the deed, it is a fraud on C, if A in fact had no authority. That the grantee of Cavarly had notice, is proved by the deed from Cavarly. That the defendant had notice, is plain from the fact that he bought without warranty, which he would not do without the exhibition of the title papers. Three years before his deed, the supreme court decided that such a deed conveyed no title, of which he is presumed to have had notice, as the decisions of the supreme court of a state are the law, and every man is presumed to know the law of the land. They were purchasers with notice, and therefore fraudulent. The auditor professes to sell, not his own land, but that of another; his authority to do this is a natural inquiry with the purchaser. Among others, two things must exist: First, delinquency; second, notice of the intention of the auditor to sell. These inquiries will of course be made by the purchaser, and if he fails or neglects to seek information, it is at his risk; he becomes his own insurer, and can not protect himself under the plea of innocent purchaser without notice.

The land in controversy has been sold by the auditor for $1 84 to Cavarly, a little more than a cent an acre. In a contest between Cavarly and the plaintiff, who would sympathize with Cavarly? Can the defendant who purchased with notice claim more? This court will not inquire into the conscience of the man whose morality will allow him to sleep quietly after appropriating to himself one hundred and sixty acres of valuable land for the pitiful sum of one dollar and eighty-four cents. It is sufficient to say that he can not challenge any sympathy of this court. Nor does his grantee stand better.

With a full knowledge of the nature of the transaction, he thrusts himself forward to assist Cavarly to consummate the speculation. He had sufficient warning. First, Cavarly was a lawyer; if he had no doubt of his title, he would have given a general warranty deed, and would have obtained a sound price for a sound title; his declining to do so was sufficient to alarm the fears of his grantee. Second, it is a notorious fact that there never has been entire confidence in titles derived from tax sales; hence, there were different prices for patent titles from tax titles, the latter much lower. Third, the uniform decisions of the courts of the United States and the states, are that the holders of tax titles must show that the officer selling had complied with all the requisites of the laws under which he acted. So universal has this been, that no case has been shown where a tax title has been maintained; nor is it known that any one has been successful in the assertion of such title in any of the states. This was enough, of itself, to put the purchaser on his guard.

Cavarly, then, and those holding under him, are of equal demerit, so far as to the paper title—all holding under the auditor's deed upon the tax sale, and all with full notice. But it is contended, with great earnestness and ability, that, if the tenant entered and occupied, believing his title good, his seven years' possession will protect him. This is probably true; but the difficulty is not thereby removed. The question still remains, how is this belief to be established? Not by the declaration of the tenant. Not by his acts, because his motives for them might be other than might be ascribed to him. This is properly a question of law. The belief must be a legal and intelligent belief, and can only be arrived at by an inspection of his title. If the judge shall, upon its inspection, pronounce it "a connected title in law or equity, deducible of record," etc., he would be protected under the eighth section of the act of 1835, called the limitation law. The same would arise where the occupant held under "claim and color of title, made in good faith."

It was well contended by the plaintiff's counsel, that any other construction would subject the title to a trial of the intelligence of the occupant, and could not be decided without taking the measure of his capacity to judge. This would make the defense good for one man and fail with another; that it could not be known whether or not he would be protected until it could be ascertained what was the state of his intellect. And how is this to be inquired into? The court can not in any case: and in this case at bar, no proof was offered to the court to enable it to form an opinion. The court then must examine the title offered by the defendant, and decide whether it is such a title as is indicated by the statute. Whatever the law makes it, so it must be assumed that the

party regarded it. All men who are allowed to manage their own affairs, are on a level in court, and presumed to know the law.

Judgment for the plaintiff.