## ATKINS v. THE DISINTEGRATING COMPANY.

1. An entry on the record of an admiralty case, that on the return of a process of attachment Mr. B. "appears for the respondent, and has a week to perfect an appearance and to answer," is an appearance, the entry being followed by the execution by the respondent or his agents of different bonds, reciting "that an appearance in the case had been entered."

2. A District Court of the United States, when acting as a court of admiralty, can obtain jurisdiction to proceed *in personam* against an inhabitant of the United States not residing within the district (within which terms a corporation incorporated by a State not within the district is meant to be included), by attachment of the goods or property of such inhabitant found within the district.

APPEAL from the Circuit Court for the Eastern District of New York.

Atkins filed a libel in the District Court for *the Eastern District of New York*, in a cause civil and maritime, against the Fibre Disintegrating Company; styling it "a corporation duly incorporated," but not saying by what State incorporated, nor anything else about it; the company having in fact been incorporated by the State of New Jersey, a State not within the limits of any judicial district of New York, but on the contrary forming in itself the judicial "district of New Jersey."

The libel was on a charter-party of the ship Hamilton, executed in New York, and was to recover:

1. Freight due the ship for bringing a cargo from Kingston and Port Morant in the island of Jamaica.

2. For demurrage for the ship while getting a cargo.

3. For damage to the ship by getting on a reef at Port Morant.

It alleged that the company had chartered the ship to proceed to Kingston, a deep-water and safe port for a full cargo, freight to be paid at a price named; that twenty running lay days were allowed for loading, and, for any delay beyond that, $100 per day demurrage; that if a full cargo should not be provided at Kingston, then the company had the privilege of sending the vessel to *a second safe port;* that the company, in violation of the charter, had sent the ship to Port Morant, an unsafe port, whereby the vessel was delayed, and, by the unsafeness of the port, got aground and was damaged.

It prayed for process and a citation to appear, *and if the defendants should not be found, that an attachment might issue against their property in the district.*

Process according to the prayer issued accordingly, June 14th, 1866, returnable June 20th, 1866.

The process was returned as follows:

Respondents not found in my district, and I attached all the property of the respondents found in their factory in Red Hook Point, in the city of Brooklyn.

A. F. CAMPBELL,

June 20th, 1866.                               United States Marshal.

The record, under date of this same 20th of June, noted a return of the service, with an entry thus (Mr. Beebe being a proctor of the court):

"Mr. Beebe *appears for the respondent, and has a week to perfect appearance,* and to answer."

And on the same day with Mr. Beebe's action, the said 20th, a motion was made on the part of the defendants, with stay of proceedings, to show cause why the property attached should not be discharged; the ground of *this* motion being that the business of the company was carried on at Brooklyn, in the Eastern District of New York, and that its officers were all at its factory there during business hours, and that service of process could have been made on them, but that such service had purposely not been made in order to attach property.   The hearing of the motion being deferred,

the defendants, by consent, were allowed to give stipulations for value and to take the property attached, without prejudice to the motion already made, and with an agreement that if the motion to discharge the property should be granted, the stipulations should be cancelled.

The stipulation for costs, acknowledged July 6th, 1866, contained a recital that "an appearance had been filed in the cause by the said Disintegrating Company." The stipulation for value, which was signed by the president of the company and two of the directors, and which was acknowledged July 7th, 1866, contained a recital that *an appearance had been duly filed by said Fibre Disintegrating Company*, and provided for notice of the final decree to Beebe, Dean, and Donohue, *proctors for the claimants of the property attached, and the defendant;* and the papers were signed and indorsed "Beebe, Dean, and Donohue, proctors."

The motion to discharge the property attached was never decided. But a motion was made in March, 1867, to set aside and vacate the clause of attachment contained in the motion and all proceedings under it; *this* motion being based upon this clause in the eleventh section of the Judiciary Act:

"And no CIVIL SUIT shall be brought before either of said courts against an inhabitant of the United States, by any original process, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ."

The ground of the application was that the respondents at the time of the issuing and serving the process were non-residents of the Eastern District of New York, and had not been found therein at the time of serving the writ.

The motion was opposed by the libellants, who argued that a cause in the admiralty was not a "civil suit" within the meaning of the clause relied on, and, therefore, that the clause did not apply; while for the rest, that the proceeding by attachment against an absconding, absent, or non-resident debtor, was one, they argued, inherent in courts of

admiralty and practiced from the earliest times. In support of this view reliance was had on Clerke's *Praxis*, an old but authoritative book of the time of Elizabeth, and on Browne's *Civil Law and Law of Admiralty.* Clerke's *Praxis*, translated, read thus:

" SECTION 24. If the defendant so conceals himself, or perhaps he is absent from the kingdom, that he cannot be arrested, then if he shall have any goods, wares, or ship, or any part of a ship, or boat upon the sea or within the flow and reflow of the sea, then a warrant is to be taken out to this effect, to arrest such goods or such a ship, &c., belonging to N., that is, to the defendant debtor, in whosesoever hands they may be, and to cite, with such goods, N., the debtor, specially, and all others generally who have or pretend to have any right or interest in the said goods, to appear on such a day to answer the plaintiff in a certain civil and maritime cause."

Browne's language* was thus:

" Let us, lastly, suppose that a person against whom a warrant has issued cannot be found, or that he lives in a foreign country: here the ancient proceedings of the admiralty court provided an easy and salutary remedy. . . . They were analogous to the proceedings by foreign attachment under the charters of the cities of London and Dublin. The goods of the party were attached to compel his appearance."

Opposed to this it was said that the present cause was palpably a " civil suit;" that the clause of the eleventh section relied on, therefore, did apply. But that if this were otherwise, and if there were no statutory prohibition, that the attachment ought to be set aside; for that while the ancient usage of the admiralty allowed the process of attachment if the defendant concealed himself, or had absconded, or were an alien non-resident—to which cases the language of Clerke and Browne, as of other writers, applied—neither such ancient practice nor any proper practice allowed it, nor would the language of either of the authors cited justify it in application to a case where the defendant was not alien.

---

* Volume 2, page 434 ; and see pages 333 and 433.

to the United States (in whose courts the case was), had not concealed himself, and had not absconded, but contrariwise was a person (an artificial person), incorporated by one of the United States, owing and paying allegiance to the government, and neither absent, nor concealed, nor absconding; but contrariwise again, at its own home in an adjoining judicial district of the United States, the district of New Jersey, in the *third* Federal circuit, where by crossing the Hudson it could be sued just as well as, and much more properly and effectively than, where it had been sued, to wit, in the Eastern District of New York, in the *second.*

The District Court denied the motion to vacate and set aside the attachment.*

The defendants then put in their answer averring performance of the charter-party and the acceptance of the cargo; that the second port had been voluntarily accepted as a safe port by the master; and also setting up that they were a foreign corporation, incorporated under the laws of New Jersey, and not residents of the Eastern District of New York, and that the libel did not allege that they resided or were in the district.

The District Court, after full argument, considering that the company, so far as the proceeding against *it* individually was concerned, had by the appearance and action of its proctor, come into court, and considering further that the merits were with the libellants, decreed against *it* individually for $13,302, an amount found due by a master; and considering also that the proceeding was not "a civil suit" within the meaning of the clause in the eleventh section, and that, independently of the prohibition there contained, the ancient usage of the admiralty did authorize the attachment, as an inherent power of the court, decreed against the property seized; or to speak, in this particular case, more literally, decreed that the stipulators should cause the stipulations which they gave on the discharge of the property from seizure, to be performed.

---

* 1 Benedict, 118.

On appeal the Circuit Court reversed the decree.

As to the matter of appearance—remarking that it was according to the ancient practice in admiralty in cases of attachment not to recognize anything as an appearance but putting in of bail—it thought that what had been done by Mr. Beebe was not to be regarded as a general appearance; that, on the contrary, he had been allowed time " to *perfect* an appearance," and had immediately moved to set aside the proceeding as unauthorized; that this motion being denied and the respondent compelled to answer, the answer was made by setting up again an invalidity; and that the libellants had stipulated expressly that the subsequent bond for value should not operate as a waiver of the respondent's motion.

Upon the other and greater question—whether a court of admiralty in one judicial district of the United States can obtain jurisdiction against an inhabitant of another district by an attachment of his goods,—the Circuit Court also disagreed with the District Court, and accordingly the whole decree was reversed.*

From that reversal the case was now on appeal here; there being, in this court, less dispute perhaps about the merits, and about whether there was a sufficient "appearance" to authorize a decree *in personam* against the corporation, than whether the proceeding was a "civil suit" within the meaning of the clause already quoted of the eleventh section of the Judiciary Act, and if it was not, whether the inherent power of the court of admiralty authorized an attachment in a case like that here issued, and where the defendant was not an alien, nor absent from his own home, nor absconding, nor anywhere concealed.

What answer should be given to the first part of this chief question, it was admitted on both sides, was a matter which received light from certain provisions in the Constitution, and also from enactments of Congress other than the exact clause of the eleventh section, on which the question turned.

---

* Of course, in the view taken in the Circuit Court, no discussion about merits was necessary.

Some of these may be recited.

The Constitution, as sent forth by the Convention of 1787, and as adopted, in the same article* which ordains—

"That the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction "—

Ordains also :

"The trial of all crimes, except in cases of impeachment, shall be held in the State where the said crime shall have been committed."

And as amended in 1789, by the first Congress :†

" In criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed."

Passing now to legislative enactments. The " Act to establish the Judicial Courts of the United States," commonly called the Judiciary Act, and passed September 29th, 1789,‡ enacts :

"SECTION 9. That the District Courts shall have, exclusively of the courts of the several States, cognizance of all crimes and offences that shall be cognizable under the authority of the United States, committed within their respective districts, . . . where no other punishment than whipping, &c., is to be inflicted:

" And shall also have exclusive original cognizance of all *civil causes of admiralty and maritime jurisdiction,* including all seizures under laws of impost . . . . where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas. . . .

" And shall also have exclusive original cognizance of all seizures on land or other waters than as aforesaid made, and of all *suits* for penalties incurred under the laws of the United States :

" And shall also have cognizance concurrent with the courts of the several States or the Circuit Courts, as the case may be, of *all causes* where an alien sues for a tort only in violation of the law of nations or a treaty of the United States :

---

* Article III, section 2.    † Amendment VI.    ‡ 1 Stat. at Large, 73.

"And shall also have cognizance, concurrent as last mentioned, of all *suits at common law*, where the United States sue and the matter in dispute amounts, exclusive of costs, to the sum or value of $100:

"And shall also have jurisdiction, exclusively of the courts of the several States, of *all suits against consuls or vice-consuls*, except for offences above the description aforesaid:

"And the trial of issues in fact, in the District Courts, in all causes *except civil causes of admiralty and maritime jurisdiction*, shall be by jury."

Next in order of matter comes the eleventh section, in which is found the clause upon which the case turned:

"The *Circuit* Courts shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature, at common law or in equity*, when the matter in dispute exceeds, exclusive of costs, the sum or value of $500, and the United States are plaintiffs, or petitioners, or an alien is a party, or the suit is between a citizen of the State where the suit is brought and a citizen of another State.

"And shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the District Courts of the crimes and offences cognizable therein; *but no person shall be arrested in one district for trial in another, in any civil action, before a Circuit or District Court. And no civil suit shall be brought before either of said courts against an inhabitant of the United States by any original process in any other district than that whereof he is an inhabitant or in which he shall be found at the time of serving the writ.*"

Then follows:

"SECTION 21. From final decrees in a District Court, in *causes of admiralty and maritime jurisdiction*, where the matter in dispute exceeds the sum or value of $300 . . . an appeal shall be allowed to the next Circuit Court to be held in such district.

"SECTION 22. Final decrees and judgments in *civil actions* in a District Court, where the matter in dispute exceeds the sum or value of $50, . . . may be re-examined and reversed or affirmed

in a Circuit Court holden in the same district upon *a writ of error.*"

So far as to the Judiciary Act.

"An act to regulate processes in the courts of the United States"—a temporary Process Act—passed September 29th, 1789,* five days after the passage of the Judiciary Act, enacted:

"That until further provision shall be made, and except where by this act or *other statutes of the United States* is otherwise provided, the forms of writs and executions . . . and mode of process, and rates of fees, . . . in the Circuit and District Courts, *in suits at common law,* shall be the same in each State respectively as are now used  . . . in the Supreme Court of the same.

"*And the forms and modes of proceeding in causes of equity and of admiralty and maritime jurisdiction shall be according to the course of the civil law.*"

And "An act for regulating processes," &c.—the permanent Process Act—of May 8th, 1792,† enacts:

"Section 2. That the forms of writs, executions, and other process, ... . and the forms and modes of proceeding in *suits*—

"In those of the common law shall be the same as are now used in the said courts, respectively, in pursuance of the act entitled 'An act to regulate processes in the courts of the United States' [the last above-quoted act]—

"In those of equity and in those of admiralty and maritime jurisdiction, according to the principles, rules, and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law, *except so far as may have been provided for by the act to establish the Judicial Courts of the United States,* subject, however, to such alterations and additions as the said courts respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule, to prescribe to any Circuit or District Court concerning the same."

By an act of 23d August, 1842,‡ in the nature of a process act, it is enacted:

---

* 1 Stat. at Large, 93.     † Ib. 276.     ‡ 5 Id. 517.

" That the Supreme Court of the United States shall have full power . . . to prescribe, regulate, and alter the forms of writs, and other process to be used and issued in the District and Circuit Courts, . . . and the forms and modes of framing and filing libels, bills, and answers, and other proceedings, and pleadings in suits at common law, or in admiralty, or in equity, and *generally to regulate the whole practice of the said courts.*"

Under the power given by these acts, the said court, by its second Rule in Admiralty, provided that:

" In suits *in personam* the mesne process may be by a simple warrant of arrest of the person of the defendant in the nature of a capias; or ' *by a warrant of arrest of the person of the defendant, with a clause therein that if he cannot be found to attach his goods and chattels,*' &c., or by a simple monition in the nature of a summons to appear and answer."

*Messrs. E. C. Benedict, for the libellants, appellants here; a brief of Messrs. George Willey, J. E. Cary, and H. L. Terrill, on the same side, though in another case, being filed in this case by leave of the court:*

Assuming, as we think is sufficiently plain, that the defendants did enter their appearance, and that, on the merits, the case was with the libellants, we pass directly to the great question of the case,—the question, namely, whether the right exists to attach in the admiralty the property of a defendant who was not found in the district.

The question is not new. It was raised in the year 1802, only ten years after the passage of the Process Act of 1792, in *Bouysson & Holmes* v. *Miller & Ryley,*\* in the District Court of South Carolina, before Judge Bee, then the judge of that court. That cause appears to have been fully and ably argued as " a new question," where it was necessary to investigate the jurisdiction of the admiralty as to matters civil and maritime, and the learned judge declares:

" I have fully considered the circumstances and arguments brought before me, and am clearly of opinion that attachments

---

\* Bee, 186.

against the goods, or debts of absent persons, may issue out of this court of admiralty. If the actors cannot proceed in this way they lose all remedy, whatever may be their right of action."

Judge Bee was an able judge; one of the sages of the law. His construction may be properly called contemporaneous with the Judiciary Act.

This right of attachment was not again questioned before 1825, when it was understood to be settled in this court by the case of *Manro* v. *Almeida.\** 

This court then said:

"Thus this process has the clearest sanction in the practice of the civil law, and during the three years that the admiralty courts of these States were referred to the practice of the civil law for their 'forms and modes of proceedings,' there could be no question that this process was legalized. Nor is there anything in the different phraseology adopted in the act of 1792 that could preclude its use. That it is agreeable to the principles, rules, and usages which belong to courts of admiralty is established not only by its being resorted to in one at least of the courts of the United States, but by the explicit declaration of a book of respectable authority and remote origin, Clerke's *Praxis,* article 28."

The question was, nevertheless, again raised on the circuit, in Rhode Island, in 1841, in *Clarke* v. *The New Jersey Steam Navigation Company.†* The opinion of Story, J., in this case has greater weight, because he was a member of the Supreme Court when the case of *Manro* v. *Almeida* was decided. He says:

"Ever since the elaborate examination of the whole subject, in the case of *Manro* v. *Almeida,* this question has been deemed entirely at rest."

And again:

"And the case does not fall within the prohibitory clause of the eleventh section of the Judiciary Act."

* 10 Wheaton, 473.                    † 1 Story, 531.

Indeed, in the case of *The Invincible*,* Judge Story had said :

"I accede to the position that in general, in cases of maritime tort, the court of admiralty will sustain jurisdiction where either the person *or his property* is within the territory.    It is not even confined to the mere offending thing."

The question was also really involved in the case of *The New Jersey Steam Navigation Company* v. *The Merchants' Bank*,† but court and counsel appear to have considered it too plain to be raised and discussed as doubtful, while the practice is distinctly recognized by this court in *Waring* v. *Clarke*,‡ where it specifies as among the cases of undoubted admiralty jurisdiction,

"Cases to enforce judgments of foreign admiralty courts, when the person *or his goods* are within the jurisdiction."

The practice, as appears by *Boyd* v. *Urquhart*,§ was familiar practice to Judge Sprague, eminent as an admiralty judge, and was discussed in *Smith* v. *Milne*,‖ and other cases of Judge Betts, not less eminent, without the suggestion of a doubt as to its regularity.    And the high authority of Judge Parsons in his work on Maritime Law,¶ and also on Shipping,** after the question had been raised, is positive in support of the validity of the practice.

Independently of authority, and by reference to the language of acts of Congress, and of the Judiciary Act especially, the matter is clear.

The eleventh section of the Judiciary Act does not extend to " *causes civil and maritime* " in the court of admiralty.    It embraces only "suits of a civil nature at common law or in equity," which are specified in the first clause of the section.

It has not been usual to consider admiralty causes as in-

---

* 2 Gallison, 41.                    † 6 Howard, 344.                    ‡ 5 Id. 452.

§ 1 Sprague, 423; and see Shorey *v.* Rennel, Ib. 418.

‖ 1 Abbott's Admiralty Reports, 373, 382; and see Reed *v.* Hussey, 1 Blatchford & Howland, 525.

¶ Page 686, note.                                        ** Page 390.

cluded in practice legislation, unless specified. Admiralty proceedings are *sui generis*, and there are other instances in which language has been used in the statutes, which at first reading would seem to include them, but which the courts have held not to include them.

Thus the act of February 29th, 1839,* ordered that no person should be imprisoned for debt in any State on process issuing out of a court of the United States, where, &c. But this was held not to include process issuing out of a court of admiralty, and parties were arrested by the admiralty courts notwithstanding this act, until this court abolished the practice by the forty-eighth rule, adopted in 1851.†

The act of 1803, ch. 40,‡ directed that "from all final judgments or decrees in any District Court, an appeal shall be allowed," &c. But Story, J., held that this did not include judgments at common law, the word "appeal" having a technical admiralty meaning.§

The act of August 23d, 1842,‖ provided that, "on *all judgments in civil cases* hereafter recovered in the Circuit or District Courts of the United States, interest shall be allowed," &c. Yet this is held not to embrace admiralty judgments.¶

But the Judiciary Act itself plainly distinguishes the different sorts of controversy.

By the twenty-first section of that act, Congress provided that "from final decrees in a District Court *in causes of admiralty and maritime jurisdiction,* where the matter in dispute exceeds $300, an *appeal* shall be allowed to the next Circuit Court."

And by the twenty-second section of the same act, Congress provided that "final decrees and judgments in *civil actions* in a District Court, where the matter in dispute exceeds $50, may be re-examined and reversed, or affirmed in

---

* 5 Stat. at Large, 321.
† Gaines v. Travis, 1 Abbott's Admiralty Reports, 422.
‡ 2 Stat. at Large, 244.    § United States v. Wonson, 1 Gallison, 11.
‖ 5 Stat. at Large, 518.
¶ Hemmenway v. Fisher, 20 Howard, 258; The Ann Caroline, 2 Wallace, 550.

a Circuit Court holden in the same district, upon a *writ of error.*"

No one will think that Congress intended by this different language to allow judgments and decrees in any admiralty causes whatever, to be reviewed on *writ of error.* But unless they did so intend, they used the words "civil actions," as *contradistinguished* from "admiralty causes."

Furthermore, it is apparent, from a comparison of the language used in the ninth, eleventh, twenty-first, and twenty-second sections of the Judiciary Act, that admiralty causes were intended to be excluded from the eleventh section. The analogy between the provisions of the ninth and eleventh sections on the one hand, and the twenty-first and twenty-second sections on the other, is obvious.

In the ninth section, Congress gave jurisdiction to the District Courts of two classes of proceedings: (1) "of civil causes of admiralty and maritime jurisdiction," and (2) of certain suits; and in the eleventh section, they gave jurisdiction to the Circuit Court of "all suits of a civil nature at common law, or in equity," &c., &c.

In the twenty-first section, they provided for the review of decrees of the District Court, in "causes of admiralty and maritime jurisdiction," *by appeal;* and in the twenty-second section, for a review of "decrees and judgments in *civil actions*" in District Courts, by *writ of error*, and also of "decrees and judgments, in *civil actions*" in the Circuit Courts, by *writ of error.*

Can it be rightly doubted that Congress intended, by this language in the twenty-first section, the same kind of actions which they intended by the *first* class mentioned in the ninth section; and that they intended, by the language in the first clause of the twenty-second section, the same kind of actions as they intended by the *second* class mentioned in the ninth section; and by the second clause of the twenty-second section, the same kind of actions as they intended by the eleventh section? Or can it be rightly doubted that, by the words "suits of a civil nature" and "civil actions," used in the eleventh and twenty-second sections, they did not mean

what :they meant in the *first* clause of the ninth and in the twenty-first sections, viz., admiralty causes?

But it will be seen that the words in question, in this case, form part of the eleventh section, and are *in pari materiâ* with the first sentence of that section. They should, therefore, be construed as having the same meaning, which excludes admiralty causes.

Can any sufficient reason be given why the words, " civil suit," in the eleventh section, should have a broader meaning than the words, " civil actions," in the twenty-second section? But the latter words, by universal consent, do not include admiralty causes.

The ninth section of the Judiciary Act gave to the District Courts the full jurisdiction of the admiralty. This cause is fully within that jurisdiction. And no limitation of that jurisdiction is to be inferred.

From the earliest periods, the distinction between common law proceedings and proceedings in causes of admiralty and maritime jurisdiction, has been maintained in the phraseology of the law. In the Constitution, when the word admiralty first occurs, and in the laws of the United States *passim,* this difference appears.

Admiralty causes are not usually called " suits " or " actions " (words which are usually applied to common law actions), but " causes,"—" a *cause* civil and maritime," a " cause of collision, civil and maritime," " a cause of contract, civil and maritime," &c. This descriptive and peculiar language is found in the commissions of the Colonial admiralty judges.* It has come down from the earliest precedents collected in Clerke's *Praxis,* which has always been accepted as the most authoritative exposition extant of the early course and usages in admiralty proceedings. Wherever Clerke has occasion to speak of an admiralty proceeding, he uses the language, " *causa civilis et maritima.*"†

In the organization of the judiciary of the United States, in 1787, the characteristic difference between the courts of

---

* Benedict's Admiralty, §§ 126, 127, 151.    † Articles 1, 9, 24, 25, 37.

common law and courts of admiralty was fully recognized and acted upon.

In the Constitution, where the word admiralty first occurs in the laws of the United States, this difference appears: "All *cases* of admiralty and maritime jurisdiction."

In the same phraseology does the Judiciary Act make a grant of jurisdiction to the District and Circuit Courts. The distinction is obviously observed in the ninth section, which speaks in one place of "civil causes of admiralty and maritime jurisdiction," and in another of "suits at common law."*

If it is asked what the words "civil suit" and "civil action" refer to in the eleventh section, as to the District Courts, the answer is, that they refer to the cases mentioned in the ninth section, suits by an alien, suits at common law for $100, suits against consuls, &c.

The same distinguishing language, above mentioned as so common in the Judiciary Act, is used in other acts of Congress. Thus, in an act of April 3d, 1818,† we find the expression:

"In any suit at common law, or in any civil cause of admiralty and maritime jurisdiction."

The temporary Process Act of September 29th, 1789 (five days after the Judiciary Act), provided separately for suits at common law and causes of admiralty and maritime jurisdiction. It provided that the process and proceedings "in the Circuit and District Courts in suits at common law" shall be like those in the State courts. And that "the forms and modes of proceedings in causes in equity and of

---

* See also the thirtieth section, prescribing the mode of taking depositions. Instead of saying "all actions" or "all civil actions," the legislature mentions admiralty in this peculiar language, "as well in the trial of causes in equity, and of admiralty and maritime jurisdiction, as of actions at common law." And in other portions of the same section occur the phrase "causes of admiralty and maritime jurisdiction."

† 3 Stat. at Large, 414; see also act of September 29th, 1789; act of May 8th, 1792; and act of July 16th, 1862.

admiralty and maritime jurisdiction shall be according to the course of the civil law." This, if at all inconsistent with the Judiciary Act, modified and controlled that act, being passed of a later date.

Thus the admiralty system of the United States, in its very inception, adopted and embraced this very proceeding of attachment, which is a familiar and undisputed proceeding of the civil law. That practice prevailed as the civil law practice till May, 1792, when the new Process Act was passed, which enacted that the practice of the common law courts should be as before established, and that in those of equity and of admiralty and maritime jurisdiction it should be "according to the principles, rules, and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law." Thus the old practice was continued without change, the admiralty process and the civil law process being identical, so far as this proceeding is concerned.

There is an exception upon which some stress will perhaps be laid, "except so far as may have been provided for by the Judiciary Act." Many things are provided for in the Judiciary Act which were not to be repealed by this Process Act, such as the power to make rules, to grant injunctions, to consolidate actions, to regulate arrests, bail, and imprisonment, to cure and amend defects in proceedings, to regulate clerks, marshals, jurors, lawyers, district attorneys, &c., &c.

Besides this exception, this practice was to be "subject, however, to such alterations and additions as the courts" may make in their own practice, and "to such regulations as the Supreme Court shall think proper by rule to prescribe." The District Court of New York made its rules authorizing this proceeding in question in 1828, which have been continued to this day. And the Supreme Court in 1842 made the admiralty rules authorizing this practice.

Therefore, even if this provision of the eleventh section did include admiralty causes, still, unless that section was beyond repeal or modification, the Process Act of 1789, and

the Process Act of 1792, and the act of 1842, §§ 6, 7, and the second admiralty rule, have modified the practice and fully authorized this mode of proceeding, which is the familiar practice of the civil law and of the admiralty courts from the earliest periods.

Difficulties were found to arise, in suits at law and in equity, under this clause of the eleventh section, owing to the residence of defendants in different districts.   In 1839, therefore, Congress passed an act which, as Mr. Law says,* "was intended to remove the many difficulties arising in practice, in cases of law and equity, under the third clause of the eleventh section of the act of 1789."

These difficulties, which, if that clause of the eleventh section had included admiralty causes, would have been *more certainly* experienced in them than in suits at law or equity, had not been met with in admiralty, owing to the course of decisions which we have cited above sustaining the admiralty process of attachment against absent debtors. To this fact, doubtless, it is due that, by this act of 1839, the difficulties in question were removed from the practice in "suits at law or in equity," while causes of admiralty jurisdiction are not mentioned.

The passage of such an act is the strongest legislative approbation of the judicial interpretation which had been put upon the Judiciary Act.   In no other way can the failure to mention admiralty causes be accounted for.

*Mr. C. Donahue (a brief of Mr. G. B. Hibbard on the same side, though in another case, being filed by leave of the Court), contra :*

It would seem rather out of strict practice, on a great question of Federal jurisprudence—one which nothing but a solemn decision of this the highest court of the land can settle,—to be citing as authority—citing especially on an appeal from a *Circuit* Court—such cases as *Bouysson & Holmes* v. *Miller & Ryley*, or *Smith* v. *Milne*, decided in *District* Courts, or even to be citing *Clark* v. *The New Jersey Steam*

---

* Law's United States Courts, 84, n.

*Navigation Company, The Invincible,* and other cases decided by a Circuit Court. The appeal here being from a Circuit Court, presumptively as right and certainly of technical authority equal to that of other Circuit Courts, such citations seem of small value. Certainly, if the cases cited did all pass on the very point here under discussion, and if they would thus bind the courts which decided them, they have no authority in this court. If they had, the decision by Mr. Justice Washington, of the Third Circuit, in *Ex parte Graham,** by Mr. Justice Hoffman, of the California District, in *Wilson* v. *Pierce,†* of Mr. Justice Shipman, of the Connecticut District, in *Blair* v. *Bemis* (not perhaps reported), and the very adjudication from which the present appeal is taken—could be opposed to them.

The decision here and now must be rested upon cases in this court, of which it is not pretended by opposing counsel that more than one—*Manro* v. *Almeida*—has adjudged the chief question under argument. If an analysis of that only case presented, shows that while its general purpose has been rightly conjectured, its precise limitations and bearings have not been attended to, and that it has no real bearing on the matters now in issue, then we must examine, in their exactness of phrase, the great statutory enactments which lie at the base of the jurisdiction set up, and if the language is at all obscure or difficult, then the history, and principles, and objects of these enactments. The examination in all its branches is thus made by Mr. Justice Woodruff, in the opinion of the court below; an opinion which refers, moreover, to some minor cases which we have named. We refer to the opinion not as authority, but as an argument which we think cannot be answered. It says:

"The general proposition deducible from the Judiciary Act, and from the act of August 23d, 1842, was decided by the Supreme Court of the United States, in the case of *Manro* v. *Almeida,* in 1825, and is not open for discussion in this court, namely, that the courts of the United States, proceeding as

---

* 3 Washington's Circuit Court, 460.    † 15 Law Reporter, 137.

courts of admiralty and maritime jurisdiction, may issue the process of attachment to compel appearance, in cases of maritime torts and contracts.

"As that is the only case in which the question appears to have been raised and passed upon in that court, and as the decision of that court is conclusive, it is important to state what the case was in which the above general proposition is held, and to what precise extent the decision goes. The libel was filed in the District of Maryland, charging Almeida with having committed a tort, on board a certain vessel off the Capes of the Chesapeake, in taking therefrom $5000 in specie, and converting it to his own use. It appears, by the statement of the case, that Almeida resided in the district, but had absconded from the United States, and fled beyond the jurisdiction of the court; and the libel averred, that the libellants had no means of redress but by process of attachment against his goods, chattels, and credits, which were, also, about to be removed, by his orders, to foreign parts. The goods, &c., were attached by the marshal, and a copy of the monition was left at the late dwelling-house of Almeida, and a copy affixed at the public exchange, and on the mast of the vessel containing the attached goods, &c. On demurrer to the libel, the questions decided were raised, and, from the decision dismissing the libel, an appeal was taken to the Supreme Court, and the decree was reversed. The decision affirms, therefore, that it is within the power and jurisdiction of the District Court, as a court of admiralty, to issue process of attachment to compel the appearance of a respondent proceeded against by a suit *in personam;* and that, in the United States, such process may issue against the goods of a resident of the district in which the suit is brought, whenever the defendant has concealed himself, or absconded from the country. The case of *Bouysson* v. *Miller* is referred to as an authority in this country, and Clerke's *Praxis* is cited for the general practice of the civil law. The opinion of the court shows, further, that the attachment was originally devised, and is still maintained, as a means of compelling the respondent to appear in the suit to answer, and that this is its primary object, while, if he does, nevertheless, not appear, the goods, &c., may be sold to satisfy the libellant.

"In *Cushing* v. *Laird*, recently decided in the District Court of the United States for the Southern District of New York,

Judge Blatchford has examined the subject further, and concludes, mainly upon the authority of the case of *Manro* v. *Almeida*, and of the text of Clerke's *Praxis*, that the jurisdiction and power to attach property to compel an appearance also exists in this country, where the defendant is not an inhabitant of the United States, but is an alien not found within the district, but having property there which can be attached.

" With these decisions, the present case raises no controversy. They are in perfect consistency with the ground relied upon by the respondents here, to wit, that, being in a legal sense inhabitants of the District of New Jersey, they could not be sued in the Eastern District of New York, by process of attachment and seizure of their goods. And it is of great pertinency to say that, recognizing the principles and practice sanctioned by the decisions above referred to, completely satisfies the provisions of the acts of Congress already cited, and gives a proper and sufficient field for the operation of the act regulating the practice of the court, and of the rule of the Supreme Court of the United States prescribing the process of attachment when the defendant cannot be found within the district; for, by these decisions, if he be concealed, or have absconded, or be an alien non-resident, there is occasion for the process.

" The question then recurs—and entirely without conflict with those statutes, or with the rule of the Supreme Court, or with those decisions—can an inhabitant of the United States be sued, in a court of admiralty, by process of attachment of his goods, issued and served to compel his appearance, in any other district than that whereof he is an inhabitant?

" It is of some significance to note that the Constitution of the United States had provided, prior to the passage of the Judiciary Act, that ' the trial of all crimes, except in cases of impeachment, . . . shall be held in the State where the said crime shall have been committed;' and an amendment proposed by the same Congress, and at the same session, at which the Judiciary Act was passed, provides that, ' in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed.'

" That an attachment of goods to compel appearance, and a holding thereof to answer any claim which a plaintiff may recover, is ' original process,' within the meaning of the language

of the clause in question of the eleventh section of the Judiciary Act, is not doubtful.    That the Circuit and District Courts of the United States cannot send their process into another district, in suits at common law or in equity, and thereby obtain jurisdiction of the person, is also clear.    That, in actions at the common law or in equity, they cannot proceed by attachment, and so obtain jurisdiction of a person who is an inhabitant of another district, is settled.    In such actions, the statute applies according to its very terms; and, in order to jurisdiction, the defendant must be an inhabitant of the district in which the suit is brought or be found therein, if the defendant be an inhabitant of any of the United States.    If, then, the present is a 'civil suit,' within the meaning of the act, there is an end of the question, and jurisdiction of the defendant could not be acquired by attachment of goods.

"1. The restriction cited, and which forms part of the eleventh section, is not confined, in its operation, to the jurisdiction conferred by that section.    This is clear, because no civil jurisdiction is, by that section, conferred upon the District Courts; and yet the restriction forbids that any civil suit shall be brought before either the District or Circuit Court in any other district, &c.    The words 'District Court,' and 'either of said courts,' would be senseless and inoperative if the restriction did not apply to other actions than those which were authorized by that section.    The terms, therefore, plainly apply to the District Court in the exercise of some jurisdiction theretofore mentioned, and must operate to limit or explain the powers given to those courts in the previous ninth section.    Including both courts in terms, the limitation operates upon the jurisdiction of each conferred by that section.    This is also settled by the cases cited; for, if it were otherwise, then the District Court could, in the exercise of such common-law jurisdiction as is given by the ninth section, proceed by attachment.

"2. The Congress of the United States, when this restriction was imposed, were in the very act of framing a judicial system. They provided for the organization of the courts, for a distribution thereof throughout the States, bringing the Federal tribunals within easy approach by every citizen, for the determination of controversies deemed appropriate to those tribunals. Their jurisdiction as to subject-matter was made to depend chiefly upon the nature of the subjects and the residence of the

parties, who, when of different States, might prefer a tribunal existing and acting in freedom from State influence.    The courts of original jurisdiction were located in each district.    As they acted not under local authority, but derived their power from a government embracing the entire Union, they might seem warranted in entertaining suits against defendants residing in any State, however remote, and in sending process for service compelling appearance.    It was, therefore, of great and manifest importance, that some rule on this subject should be prescribed; and it was done so as to prevent parties proceeded against from being called to a great distance to defend actions brought against them, when there was a Federal tribunal at their own door competent to administer justice.

"3. There is, therefore, no possible reason for any distinction in this respect between a suit in admiralty and a suit in equity or a suit at law.    A suit *in personam* in the court of admiralty is within the jurisdiction of that court, when founded on a maritime contract, or prosecuted for a marine tort.    But no reason can be stated for requiring a party living in New Orleans or San Francisco, to come to New York to defend an action or suit on the covenants in a charter-party, when he ought not to be required to come there to defend a suit at law or in equity founded on any commercial or common-law contract.    For a marine tort committed by a resident of New Orleans, he is liable at common law, and may also be held liable in the court of admiralty.    There is no just reason for holding him to answer in such case in any District Court of the United States, however remote, if the plaintiff elects to proceed in admiralty; while, if the plaintiff proceeds at common law, he must sue in the district of the defendant's residence, or in the district in which he may be found.    The reason of the act of Congress includes suits *in personam* in admiralty, as fully as in equity or at law.

"4. The word 'civil' is used in the act in distinction from 'criminal.'    In the ninth and eleventh sections, conferring jurisdiction on the District and Circuit Courts, Congress had spoken of 'crimes and offences,' 'civil causes of admiralty and maritime jurisdiction,' 'suits for penalties and forfeitures,' 'causes where an alien sues for a tort,' 'suits at common law,' 'suits against consuls' other than 'for offences,' and 'suits of a civil nature at common law or in equity.'    They then declare that 'no civil suit' shall be brought, &c.    A civil cause of admiralty and mari-

time jurisdiction is prosecuted by a suit. It is within the terms of the restriction as closely as a cause ' where an alien sues for a tort.' It was wholly unnecessary, in the restrictive clause, to recite again the several terms previously employed, as suits for forfeitures, suits against consuls, suits at common law, &c., and civil causes in admiralty. These are all civil in their nature. A cause in admiralty is so expressly described. It is a civil cause. The general term 'civil suit' was apt to describe all these actions and causes of action, and it was so employed. And, as the Constitution provided that criminal prosecutions, jurisdiction whereof was given by this act to the Circuit and District Courts, should be had in the State where the crime was committed; so, also, civil suits against an inhabitant of the United States were required to be brought in the district whereof he was an inhabitant. Jurisdiction of crimes and offences, as well as of proceedings of a civil nature, being conferred on these courts by the sections mentioned, this classification, by the word 'civil,' as distinguished from 'criminal,' was an essential conformity to the constitutional requirement, that crimes and offences should be prosecuted where committed. The restriction, therefore, made the system in this respect complete.

"5. This view of the effect of this statute, securing to inhabitants of the several States the right of being sued within the district whereof they are respectively inhabitants, is, therefore, in perfect consistency with the claim, that courts of admiralty have general power to proceed *in personam* by attachment of goods, where the defendant cannot be found within the district, so far as that is asserted in *Manro* v. *Almeida*,* in *King* v. *Shepherd*,† in *Boyd* v. *Urquhart*,‡ or in *Bouysson* v. *Miller*.§ The limitation is the result of the act of Congress, and does not deny the original jurisdiction or practice of those courts, or their present power or jurisdiction where the respondent is an alien non-resident; or, being an inhabitant of the district, conceals himself or absconds, so that he cannot be found.

"6. To the suggestion, that the acts of Congress regulating the process and practice of the courts are in such general terms that they and the rule of the Supreme Court in admiralty have operated to modify the act of 1789 limiting jurisdiction in this

---

* 10 Wheaton, 473.   † 3 Story, 349.   ‡ 1 Sprague, 423.   § Bee, 186.

respect, it is sufficient to say, that these acts are not designed to alter or enlarge the jurisdiction of the courts, but only to regulate the exercise of jurisdiction where it exists. I understand this to be distinctly affirmed in *Toland* v. *Sprague.** Indeed, if these acts are held to authorize the Supreme Court in any respect, by rule, to abrogate the restriction in the act of 1789, it cannot be confined to the jurisdiction of courts of admiralty. For the act of 1842 gives the same power touching proceedings at the common law and in equity as in admiralty; and the construction and effect contended for would enable that court practically to repeal all the restrictions contained in the act of 1789 on this subject, and to authorize common law actions against inhabitants of any State to be brought in any district of the United States.

"Of the cases of *Clarke* v. *The New Jersey Steam Navigation Company,*† and *The New Jersey Steam Navigation Company* v. *Merchants' Bank,*‡ it is sufficient to say, that the point discussed in this case was neither raised nor decided in either; and the first named case is full to the effect above asserted, that, on this question, a corporation stands in the same position as a natural person. The effect of the eleventh section of the Judiciary Act on the power of the court to proceed against either, was not raised, discussed, or decided. The decision in the last-named case related, first, to the merits; and, second, to the inquiry whether the case was, in its nature, cognizable in a court of admiralty. The synopsis of the case first named, as reported, would suggest that the point in question was decided adversely to the views here expressed; but, in truth, the point was not raised, the opinion stating that it had not been doubted, and referring to the general doctrine of *Manro* v. *Almeida,* with which these views are in no conflict."

Mr. Justice SWAYNE recapitulated the facts of the case and delivered the opinion of the court.

The libel is founded upon a charter-party and seeks to recover freight earned by the ship Elizabeth Hamilton in bringing a cargo of bamboo from Kingston and Port Morant, in the island of Jamaica; for demurrage while the ship

---

* 12 Peters, 300.            † 1 Story, 531.            ‡ 6 Howard, 344.

was obtaining the cargo, and for damages to the ship by getting on a reef when leaving Port Morant.

The libel alleges that the respondents are a corporation, and have property in the district, and prays for process against them, and, if they were not found, that a foreign attachment issue against their property in the district, and for a decree for the amount claimed, with interest and costs. The libel was filed on the 13th of June, 1866. On the day following a citation was issued with a foreign attachment clause. On the 20th of the same month the marshal returned that the respondents were not found in his district, and that he had attached all the property found in their factory at Red Hook Point, in the city of Brooklyn. In a journal entry of the same date it is stated: " Mr. Beebe *appears* for respondent, and has a week to perfect appearance and to answer." On the 19th of July following the respondents executed a stipulation for costs. It recited that " an appearance has been filed in said cause by said disintegrating company." On the same day the proctors for the libellants consented that the property attached should be discharged from custody upon the respondents giving a stipulation for its value in the sum of $25,000, and they agreed that in case the judge should grant the motion to discharge the property, the stipulation should be cancelled, and that " the stipulation for value is given without prejudice to such motion." The stipulation for value was thereupon filed. That also recited " that an appearance has been filed by said company." On the 3d of May, 1867, the respondents filed their answer. Among other things it averred that they were a foreign corporation, created by the laws of New Jersey, and were not residents of the Eastern District of New York; and that it was not alleged in the libel that they were either found in the district or resided in the district, and they craved the same benefit and advantage as if they had formally excepted to the libel. It does not appear that the motion to discharge the attachment was ever decided. But by an entry of the 22d of March, 1867, it appears that a motion had been made to vacate the attachment

clause in the monition, and all the proceedings under it, upon the ground that under the circumstances the eleventh section of the Judiciary Act of 1789 denied jurisdiction to the court, and that the motion was overruled. The cause was heard in the District Court upon the merits on the 16th of December, 1867. The court made an interlocutory decree, disallowing the claim for damages to the ship, but referred the case to a commissioner to ascertain the amount which the libellants were entitled to recover in respect of their other claims. The commissioner made his report. No exception was taken by either party. The court confirmed the report and decreed accordingly. The libellants appealed from so much of the decree as refused them damages for the injury sustained by the ship in leaving Port Morant. The respondents appealed from the whole decree. The Circuit Court reversed the entire decree, and the libellants thereupon appealed to this court. The case is thus brought before us.

The statement of the case, which we have given, shows that the defendants entered their appearance without reservation. If there could be any doubt upon the subject it is removed by their repeated subsequent recognitions of the fact. This made their position just what it would have been if they had been brought in regularly by the service of process. In this aspect of the case all defects were cured and the jurisdiction of the court over their persons became complete.* This warranted the decree *in personam* for the amount adjudged to the libellants.

But the stipulation for value was entered into subject to the motion to discharge the property attached; the stipulation to be cancelled if the motion prevailed. Though this motion was not decided, the subsequent motion, founded upon the eleventh section of the Judiciary Act, took its place and had the same effect. The latter motion was overruled, and the decree required the stipulators to perform

---

* Pollard *v.* Dwight, 4 Cranch, 421; Knox *v.* Summers, 3 Id. 496.

their undertaking.   The Circuit Court reversed the decree by reason of the facts relied upon in support of the motion to vacate.   If the attachment clause was void for want of jurisdiction in the District Court to issue it, the seizure of the property was a trespass, and the stipulation a nullity, irrespective of the reservation which it contained.   These considerations render it necessary to examine the case both as to the merits and the jurisdictional question thus presented.

In regard to the merits—after a careful examination of the record—we have found no reason to dissent from the views of the learned district judge by whom the case was heard.*   However full might be our discussion, we should announce the same conclusions.   They are clearly expressed and ably vindicated in his opinion.   To go again through the process by which they were reached would be a matter rather of form than substance.

The question of jurisdiction is of a different character, and requires more consideration.

The Constitution† declares that the judicial power of the United States shall extend to " all cases of admiralty and maritime jurisdiction."

The act of Congress of the 24th of September, 1789,‡ known as the Judiciary Act, provides that " the District Courts . . . shall have also original cognizance of *all civil causes of admiralty and maritime jurisdiction,* including all seizures under all laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts as well as upon the high seas."

The Short Practice Act of September 29th, 1789,§ required that " the forms and modes of proceedings in causes

---

* Atkins *v.* The Fibre Disintegrating Co., 2 Benedict, 381.

† Article 3, § 2.          ‡ 1 Stat. at Large, 76.          § Ib. 93.

of equity and of admiralty and maritime jurisdiction shall be according to the course of the civil law."

By the second section of the Practice Act of 1792,* it was declared " that the forms of writs, executions, and other process shall be, in suits in equity and *in those of admiralty and maritime jurisdiction*, according to the principles, rules, and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law, except so far as may have been provided for by the act to establish the judicial courts of the United States, subject, however, to such alterations and additions as the said courts respectively shall, in their discretion, deem expedient, or to such regulations as the Supreme Court of the United States shall think proper, from time to time, by rule to prescribe to any Circuit or District Court concerning the same."

The act of the 23d of August, 1842,† authorized the Supreme Court " generally to regulate the whole practice" of the Circuit and District Courts in all their proceedings.

This controversy turns upon the eleventh section of the Judiciary Act of 1789. The importance of the section in this case induces us to set it out in full:

" The Circuit Court shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature, at common law or in equity*, when the matter in dispute exceeds, exclusive of costs, the sum or value of $500, and the United States are plaintiffs, or petitioners, or an alien is a party, or the suit is between a citizen of the State where the suit is brought and a citizen of another State, and shall have exclusive cognizance of all crimes and offences cognizable under the authority of the United States, except where this act otherwise provides, or the laws of the United States shall otherwise direct, and concurrent jurisdiction with the District Courts of the crimes and offences cognizable therein; but no person shall be arrested in one district for trial in another, *in any civil action*, before a Circuit or District Court. *And no civil suit shall be brought before*

---

*either of said courts, against an inhabitant of the United States, by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ.*

"Nor shall any District or Circuit Court have cognizance of any suit to recover the contents of any promissory note or other chose in action in favor of an assignee, unless a suit might have been prosecuted in such court to recover the said contents, if no assignment had been made, except in cases of foreign bills of exchange. And the Circuit Courts shall also have appellate jurisdiction from the District Courts, under the regulations and restrictions hereinafter provided."

The prohibition to bring a "civil suit" against an inhabitant of the United States in a district other than that whereof he is an inhabitant, or in which he shall be found, is the hinge of the controversy between these parties. The appellees maintain that a cause of admiralty jurisdiction is a "civil suit" within the meaning of this prohibition. The appellants maintain the contrary. Our views coincide with those of the appellants, and we will proceed to state succinctly the considerations which have brought us to this conclusion.

It may be admitted that an admiralty case is *a civil suit* in the general sense of that phrase. But that is not the question before us. It is whether that is the meaning of the phrase as used in this section. The intention of the lawmaker constitutes the law.* A thing may be within the letter of a statute and not within its meaning, or within its meaning though not within its letter.† In cases admitting of doubt the intention of the lawmaker is to be sought in the entire context of the section—statutes or series of statutes *in pari materia.*‡

---

* United States *v.* Freeman, 3 Howard, 563.

† Slater *v.* Cave, 3 Ohio State, 85; 7 Bacon's Abridgment, title Statutes, 1, 2, 3, 5.

‡ Patterson *v.* Winn, 11 Wheaton, 389; Dubois *v.* McLean, 4 McLean, 489; 1 Cooley's Blackstone, 59; Doe *v.* Brandling, 7 Barnewall & Cresswell, 643; Stowel *v.* Zouch, 1 Plowden, 365.

The general language found in one place, may be restricted in its effect to the particular expressions employed in another, if such, upon a careful examination of the subject, appears to have been the intent of the enactment.*

The first paragraph of the eleventh section defines the jurisdiction of the Circuit Court as extending to "all suits of a civil nature, at common law or in equity, where," &c. The criminal jurisdiction of the Circuit Court is next defined. Then follows the provision that no one shall be arrested in one district for trial in another "in a civil action" before a Circuit or District Court, and next the prohibition here in question.

Construing this section, down to the second prohibition, inclusive, by its own light alone, we cannot doubt that by the phrase "civil suit," mentioned in this prohibition, is meant a suit within the category of "all suits of a civil nature at common law or in equity," with which the section deals at the outset. This view derives further support from the ninth, twenty-first, and twenty-second sections of the act. The ninth section gives to the District Court its admiralty jurisdiction, its common-law jurisdiction, and its criminal jurisdiction. With reference to that first named, the language is "of all *civil causes of admiralty and maritime jurisdiction.*" As to the second, it is "*of all suits at common law,*" &c. The twenty-first section allows appeals from the District to the Circuit Court "*in causes of admiralty and maritime jurisdiction* where the matter in dispute exceeds the sum of three hundred dollars." The twenty-second section provides "that final decrees and judgments *in civil actions,*" where the matter in dispute exceeds fifty dollars, may be reviewed in the Circuit Court upon error. The distinction is thus made between admiralty and other *civil actions,* and the terms "*causes of admiralty and maritime jurisdiction,*" are applied to the former, and the phrases "*civil actions*" and "*suits at common law*" to the latter.

---

* Brewer *v.* Blougher, 14 Peters, 198, 199; Miller *v.* Salomons, 7 Exchequer, 546; Same Case in error, 8 Id. 778; Waugh *v.* Middleton, Ib. 356, 357.

We think the conclusion is inevitable that the terms *civil suit*, in the eleventh, and *civil actions*, in the twenty-second section, were intended to mean the same thing.   The meaning of the phrase employed in the latter admits of no doubt. The language there is " civil actions," and it is used to distinguish them from " causes of admiralty and maritime jurisdiction," provided for in the preceding section.   The twenty-first and twenty-second sections are *in pari materia* with the eleventh, and throw back a strong light upon the question arising under the latter.   We think it dispels all darkness and doubt if any could otherwise exist upon the subject.

Our attention has been called to other instances in the laws of Congress where the same phrases are used for the same purposes of distinction between admiralty and other causes.   It is unnecessary to refer to them in detail.   The argument could not be strengthened by further support. drawn from that quarter.

. The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty, as in the case before us, has prevailed during a period extending as far back as the authentic history of those tribunals can be traced. " Its origin is to be found in the remotest history of the civil as well as of the common law."*   The rules by which it was regulated in the English admiralty are found in Clerke's *Praxis*, a work still of authority, published in the time of Elizabeth.

Browne in his Civil and Admiralty Law† says : " Let us, lastly, suppose that a person against whom a warrant has issued cannot be found, or that he lives in a foreign country : here the ancient proceedings of the admiralty court provided an easy and salutary remedy, though according to Huberus, not authorized by the example of the civil law; they were analogous to the proceedings by foreign attachment under the charters of the cities of London and Dublin.   The goods of the party were attached to compel his appearance. . . .

---

* Manro *v.* Almeida, 10 Wheaton, 473.                † Vol. 2, page 484.

This process of attachment went not only against those in the actual possession of himself, his factors or agents, but also against those in the hands of his debtors, since the maxim taken from the Justinian Code was *debitor creditoris est debitori creditori creditoris.*"

As in the practice of our courts of admiralty, the attachment of the goods or credits gave jurisdiction, and the cause proceeded to decree whether the defendant appeared or not.

The Constitution, in the grant of the admiralty jurisdiction, refers to it as it existed in this and other maritime countries at the time of the adoption of that instrument. It was then greatly larger here than in England. The hostility of the common-law courts there had wrought the reduction.*

While the mode of proceeding in the admiralty courts of the United States was required by the Practice Act of 1789 to be according to the course of the civil law, the process of attachment to compel the appearance of an absent defendant had the sanction of that system of jurisprudence.† It has the sanction of the act of 1792, because it is according to the principles, rules, and usages which belong to courts of admiralty. It has also the sanction of the act of 1842. Under that act this court, at the December Term, 1844, prescribed "rules of practice for the courts of the United States in admiralty and maritime jurisdiction on the instance side." The second of those rules is as follows: "In suits *in personam* the mesne process may be by a simple warrant of arrest of the person of the defendant in the nature of a capias, or by a warrant of arrest of the person of the defendant, with a clause therein that if he cannot be found to attach his goods and chattels to the amount sued for; or, if such property cannot be found, to attach his credits and effects to the amount sued for in the hands of the garnishees

---

* Manro *v.* Almeida, *supra;* Waring *v.* Clarke, 5 Howard, 455; New Jersey Steam Navigation Company *v.* Merchants' Bank, 6 Id. 389; The St. Lawrence, 1 Black, 527; The Genesee Chief, 12 Howard, 454; Insurance Company *v.* Dunham, 11 Wallace, 24; Story on the Constitution, § 1666.

† Manro *v.* Almeida, *supra.*

named therein, or by a simple monition in the nature of a summons, to appear and answer to the suit, as the libellant shall in his information pray for or elect."

The fourth and thirty-seventh rules relate to the same subject. The process in question in the case before us was issued according to the formula prescribed in the second rule, and that rule did not transcend the authority in pursuance of which it was framed.

This subject came under the consideration of the District Court of South Carolina, sitting in admiralty, in 1802.* The court held, without qualification, that it had the power to issue the process of attachment to compel the appearance of an absent defendant, and proceeded accordingly.

In the case of *The Invincible*,† decided in 1814, Mr. Justice Story said: "The admiralty may, therefore, arrest the person or the property, or by foreign attachment the choses in action, of the offending party, to answer *ex delicto*."

The question was elaborately considered by this court in *Manro* v. *Almeida*.‡ It was unanimously held that the power existed as an established mode of admiralty procedure, and an element of admiralty jurisdiction. This case was decided in 1825.

In 1841, in *Clarke* v. *New Jersey Steam Navigation Company*,§ Mr. Justice Story said: "Ever since the elaborate examination of this whole subject, in the case of *Manro* v. *The Almeida*, this question has been deemed entirely at rest."

In the *New Jersey Steam Navigation Company* v. *The Merchants' Bank*,‖ determined by this court in 1848, the defendant was a corporation foreign to the locality of the suit. Jurisdiction was obtained, as in the case before us, by attachment. Another question of jurisdiction was argued with exhaustive learning and ability; but the point here under consideration was not adverted to either by the court or the counsel.

Neither in the rules of this court nor in either of the cases

---

* Bouysson & Holmes *v.* Miller & Ryley, Bee, 186.
† 2 Gallison, 41.    ‡ *Supra.*    § 1 Story, 587.    ‖ *Supra.*

referred to is there any reference, express or implied, to the eleventh section of the act of 1789. It does not seem to have occurred to any one that the limitations in that section could have any application to proceedings in admiralty.

These facts are full of significance. They are hardly less effectual than an express authoritative negation upon the subject.*

The case of *Ex parte Graham*† is relied upon by the counsel for the appellee. It was decided by Mr. Justice Washington in 1818. Graham was arrested in Pennsylvania under process for contempt, issued in a prize case pending in the District Court of Rhode Island. Mr. Justice Washington ordered his discharge upon two grounds: (1.) That process would not run in such a case from Rhode Island into Pennsylvania. (2.) That the prohibitions in the eleventh section of the act of 1789, as to the locality of arrests and suits, applied as well to suits in admiralty as to other civil actions. It is a sufficient answer to the second proposition, that it was clearly overruled by this court in *Manro* v. *Almeida*. Mr. Justice Washington sat in that case, and must then have changed his opinion. His silent concurrence admits of no other construction.

The earliest case exactly in point, maintaining the proposition contended for by the appellee, to which our attention has been called, is *Wilson* v. *Pierce*.‡ It was decided by the learned district judge of California in 1852. He adopted the view of Judge Washington, and ruled accordingly. This case was followed by two others, one of them being the case before us.§ The other one arose in the District of Connecticut and is said not to have been reported. The cases upon the other side are numerous. We shall refer to but two of them: *Cushing et al.* v. *Laird*,‖ and *Smith* v. *Milne*.¶ The opinion of the court in each of these cases is learned

---

* Edwards *v*. Darby, 12 Wheaton, 206.
† 3 Washington's Circuit Court, 456.
‡ 15 Law Reporter, 137.        § 7 Blatchford, 555.
‖ 3 American Law Times Reports, 50.
¶ 1 Abbot's Admiralty Reports, 373.

and elaborate. Two eminent American law writers have taken the same view of the subject.* They hold that the prohibition in question does not apply to suits in admiralty.

DECREE OF THE CIRCUIT COURT REVERSED, and the case remanded with directions to

AFFIRM THE DECREE OF THE DISTRICT COURT.

Dissenting, Justices MILLER and STRONG.

### NOTE.

At the same time was argued the case of *The New England Mutual Insurance Company and others* v. *The Detroit and Cleveland Steam Navigation Company*, a case from the Circuit Court for the Northern District of Ohio, and involving the question arising in the preceding case, under the eleventh section of the Judiciary Act of 1789. It was decided in favor of the appellants; the court referring to the opinion above printed as controlling it. Dissenting, Justices MILLER and STRONG. The briefs filed in this last case, by *Messrs. Willey, Cary, and Terrill, for the appellants*, and by *Mr. G. B. Hibbard, contra*, were, by leave of the court, filed also in the preceding case.

---

* 2 Parsons's Maritime Law, 686, note; 2 Parsons's Shipping and Admiralty, 390; Benedict's Admiralty, ? 425.