## United States *v.* White (No. 514).[1]

1. "Gauffre" Defined.

"Gauffre" is a word of French derivation and is variously spelled gauffre, gauffree, gouffre, goffer, gauffer, gaufre, and gauffrer. It accords in meaning with embossed.

2. Gauffre Leather under Tariff Act of 1909.

The fact that "gauffre" had no fixed uniform trade meaning as applied to leather when the tariff law of 1909 was enacted can not be taken to shift the burden of proof on the Government in determining whether the skins imported were gauffre leather; there is necessary simply an inquiry as to what was intended by the Congress in using "gauffre leather" in that act, and to give effect, if may be, to the actual language employed. The word "cut" there appearing, it would seem was used to impress the customary features of gauffre leather, definite sizes and shapes, but in any view can not be taken to defeat the plain intention as to the dutiable status of the goods. The rate of duty was clearly ascertainable and the importation is dutiable as gauffre leather·under paragraph 451, tariff act of 1909.

### United States Court of Customs Appeals, May 22, 1911.

Appeal from Board of United States General Appraisers, G. A. 7115 (T. D. 31016).

[Reversed.]

*D. Frank Lloyd,* Assistant Attorney General (*Frank L. Lawrence* on the brief), for the United States.

*Alfred S. Hall* for appellee.

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

De Vries, Judge, delivered the opinion of the court:

This merchandise was imported at Boston. The collector at that port assessed it for dutiable purposes at the rate of 15 per cent plus 10 per cent ad valorem under the provisions of paragraph 451 of the tariff act of 1909, as "gauffre leather." The importer claims that it is properly dutiable under the same paragraph at 15 per cent ad valorem, alleging that "these goods were entered as 'finished leather' dutiable at 15 per cent ad valorem, which we claim should be so assessed under paragraph 451 of the tariff act of August 5, 1909, which includes 'all the (sheepskins) foregoing not specially provided for in this section, fifteen per centum ad valorem.'"

The merchandise presents a light gray appearance, approximating that of silver. It is concededly embossed by the use of a stamp, the impressions of which are plainly visible upon the reverse side of the merchandise, presenting raised effects upon the surface. There are added upon the surface figures in black. The appearance presented is that of a finished or ornamental leather in imitation of a lizard's skin.

It appears from the protest that the appellee is an importer and manufacturer of bookbinders' materials and fine leathers.

The collector returned that the merchandise was, in the opinion of his office, "gauffre leather."

---

[1] Reported in T. D. 31632 (20 Treas. Dec., 1093).

The Board of General Appraisers sustained the claim that the merchandise was properly dutiable as "sheepskins dressed and finished not specially provided for."

At the hearing before the board but two witnesses testified, a member and an employee of the importing firm. Their testimony, and the whole thereof, is succinctly epitomized by the board in its opinion when it states:

Two witnesses, both members of the importing firm, it is true, but of long experience in buying and selling leather of the character involved, and whose testimony is unimpeached, unite in saying that in all their experiences in the leather business they have never heard, up to the time of filing of this protest, the term "gauffre leather" used in this country, and that they had been importing and selling this particular kind of leather for seven years prior to the date of this importation and had never heard of it being called "gauffre leather," nor had any of their previous importations been so classified.

The Government offered no testimony. The case was therefore submitted upon the testimony thus epitomized, the return of the collector, and the official sample described.

The board held that the testimony offered so far disputed the return of the collector as to shift the burden of proof upon the Government.

We are unable to agree with the board in this conclusion. We have examined the testimony with care and find its import expressly as stated by the board. The fact that testimony tended to establish is that the term "gauffre leather" was not at the time of this importation known to the leather trade, and that, therefore, the terms used in the statute were not used with reference to a general uniform trade understanding. So that the result established by this testimony, if anything, would be that there was not a trade understanding confining the particular merchandise within the term "gauffre leather," and excluding therefrom all others. But that testimony in no wise negatives the existence of a descriptive force that may attend the words of the statute which includes this importation.

That these leathers as imported are within the descriptive force at least of the term "gauffre leather" is shown by previous decisions of the Board of General Appraisers and of the courts. Thus in G. A. 3730 (T. D. 17744), as early as December, 1896, merchandise was imported at the port of New York invoiced as "gaufreé leather," and was the subject of decision by the Board of General Appraisers and held dutiable as skins dressed and finished under the tariff act of 1894, rather than as manufactures of leather. The board ascertained in that case the imported merchandise to be finished leather ready for use as wall decorations and other purposes. On appeal to the United States Circuit Court for the Southern District of New York this decision was in 1898 reversed, and upon further appeal to the United States Circuit Court of Appeals, Second Circuit, the decision of the Circuit Court reversing that of the board was in 1899 affirmed.

The Circuit Court of Appeals described the merchandise the subject of this decision as "so-called 'leather gouffré'" and stated that it was constituted of "pieces of thin leather, cut uniform, 28 inches in width and from 32 to 36 inches in length.  One side is plain, while the other surface presents an embossed pattern, coated with designs in silver and various attractive colors.  These pieces are not used in the imported condition, but are cut up and made into dress trimmings. There is evidence that they are sometimes cut up and used in the manufacture of pocketbooks and other fancy leather goods.  Some- times, when thicker than these at bar, so that paste will not strike through, they are used as "wall decorations."  The courts held that they were dutiable as leather not specially provided for, and not as skins dressed and finished, reversing the decision of the board.

It will be noted that these court decisions were both rendered after the enactment of the tariff act of 1897; that gauffre leather, eo nomine, was neither a provision of the act of 1894 nor 1897.

Later and in December, 1899, the Board of General Appraisers, in G. A. 4611 (T. D. 21819), again had before it what is characterized in its opinion importations invoiced as "gauffreé leather" that were essentially the same as those described in the court decision quoted, and were held dutiable by the board as leather not specially pro- vided for under the provisions of the tariff act of 1894, and not as skins dressed and finished or manufactures of leather, the protests having arisen under that act, though the decision was rendered after the repeal of that act and during the life of the tariff act of 1897.

The lexicographic definitions of gauffre are as follows:

Oxford Dictionary:

Goffer, gauffer.—Also * * * gauffre, to stamp or impress figures on cloth, paper, etc., with tools on which the required pattern is cut, f. gaufre, honeycomb.  The usual sense of the English word is in French expressed by gauffrer a la paille, trans. To make wavy by means of heated goffering-irons; to flute or crimp.

Standard Dictionary:

Goffer.—1. To form plaits or flutes in; crimp; * * * 2. To raise in relief, as leather; gauffrer, honeycomb.

Century Dictionary and Cyclopedia:

Goffer.—(Also written gauffer; * * * crimp, * * * figure * * *.) 1. To plait, flute, or crimp.  2. To raise in relief, especially for ornamental purposes, as thin metal, starched linen, or the like.

(It should be noted that the word being of French derivation is, when used in the same sense, spelled variously as gauffre, gauffreé, gouffre, goffer, gauffer, gaufre, and gauffrer.)

These definitions accord with those of the term "embossed," and it is admitted by all parties to the record that this merchandise, as imported, is embossed.  It has in addition to embossing certain figures in jet or black.  It appears, likewise, from the decisions quoted

that the merchandise the subject of these decisions was embossed, although in addition thereto were figures in silver and other fancy effects. The essential, however, of gauffre leather, as defined by lexicographic authority, and giving those words their natural descriptive force, is leather which has been embossed.

Considering the record in this case and decision of the board in the light of these decisions and authorities, it is manifest that while the record discloses that there is no commercial signification attached to these words "gauffre leather," they have a descriptive force frequently applied to such leather that precisely covers this importation and which is uncontradicted by any testimony in this record.

There was before the board the return of the collector and a sample of the imported merchandise, both of which unmistakably evidence what is admitted by all parties to the record in this court, to wit, that the importation consists of embossed leather, to which there has been added colored figures for fancy effect.

We think that the record thus shows, without the slightest contradiction, that the imported merchandise was within the descriptive force of "gauffre leather" as used in the statute and that the board erred in holding the contrary.

We are then confronted with the modifying language of the statute and its application to the imported goods. There is no evidence in this record which discloses whether these importations were in the form of strips, such as those the subject of the court decision cited, or whether or not they were "cut" from leathers. That they are leathers is admitted by protestant. They were entered by protestant as "finished leather." They are alleged in the protests to be of "sheepskins." It is fairly within the record, therefore, by admissions made by protestant, that the importations are leathers made from sheepskins, and, therefore, we think included within the terms "all other leather," as used in the paragraph under consideration. The use of the word "cut" in the paragraph under consideration seems inapt, unless the term be applied commercially to those strips of gauffre leather alone defined in the decisions quoted. There is no testimony upon that point in this record, and so far as this record discloses trade and commerce affixes no limitation or other definition to that term measured by shape or size. In its descriptive force it would apply to any size or shape of leather embossed in the manner stated. We do not think, however, this use of the word as in this paragraph should be held to defeat the manifest purposes of Congress. It was undoubtedly the intention of Congress to levy upon these finished leathers, to which had been applied additional processes in order to emboss them and to give them fancy effects, an additional rate of duty to that levied upon the leathers from which they are made. The use of the word "cut" in the statute is in one sense

instructive and indicates that when Congress adopted this phrase it had in view the purpose of embracing and making subject to this additional duty the gauffre leather spoken of in the court and board decisions quoted. Such leathers were "cut" because they were in strips of such definite size and shape as to impress the reader that these were customary incidents of gauffre leather.

There being no evidence here that the term has other than its common and descriptive signification, which is not confined to any size or shape of leather, we must hold it descriptively applicable to these importations. That was accomplished and the additional duty levied by the use of the words "gauffre leather" alone. The remaining portion of the phrase is not used by way of description or limitation of the article upon which duty is levied, but *is a term or phrase of reference only*, indicating and pointing out the leather otherwhere in the act made dutiable, to which rate this additional rate is added. It is a term of reference and not of description. That basic provision is variable, dependent upon the proof as to what leather the particular gauffre is made from, which proof we think is fairly established in this case by the appellee's admissions in his protest.

It was the unmistakable purpose of Congress to levy an additional duty upon gauffre leather. The inapt use of the word "cut," as a word of reference to a class of merchandise and rate of duty clearly and unmistakably ascertainable, should not be held to control the application of this rate of duty to the subject matter intended by Congress to be made subject thereto. That such inapt language may be disregarded to carry out the plain and manifest intention of Congress finds ample support in numerous authorities. Thus in Lewis's Sutherland Statutory Construction, section 410, it is stated:

SEC. 410. Legislative enactments are not any more than any other writings to be defeated on account of mistakes, errors or omissions, provided the intention of the legislature can be collected from the whole statute. * * *

And in the American and English Encyclopedia of Law, under the headings, Statutes, Principles of Interpretation and Construction, vol. 26, p. 613, the doctrine is as follows:

When the intention of the legislature as gathered from all legitimate sources is taken into consideration, terms and provisions not expressly declared may be introduced into a statute by necessary or plain implication from what is directly or expressly declared. By "necessary implication" is not meant an implication that points to a result so as to leave no possible escape and to exclude every other imaginable conclusion, but one that leads to such a conclusion as, under the circumstances, a reasonable view compels the court to take, the contrary of which would be improbable or absurd.

And in Endlich on the Interpretation of Statutes, section 295, the rule is given in this wording:

Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a

construction may be put upon it which modifies the meaning of the words, and even the structure of the sentence. This is done, sometimes, by giving an unusual meaning to particular words; sometimes by altering their collocation; or by rejecting them altogether; or by interpolating other words; under the influence, no doubt, of an irresistible conviction, that the legislature could not possibly have intended what its words signify, and that the modifications thus made are mere corrections of careless language, and really give the true intention.

Numerous instances of the application of this principle are found in the decisions of the courts. United States *v.* Burr (159 U. S., 78), Atkins *v.* Disintegrating Co. (85 U. S., 272, 300), Wheeler *v.* McCormick (29 Fed. Cases, 901).

We are of the opinion, therefore, that this importation was properly assessed by the collector and that the decision of the Board of General Appraisers should be *reversed*.