Louis Dejonge & Co. *v.* United States (No. 934).[1]

Russian Calfskins, Long Grain. .

There is no commercial designation shown, but the artificially embossed surface of the goods makes them aptly described as "gauffre leather" in the common and ordinary acceptation of the term. The importation was dutiable as calfskins tanned and dressed, under paragraph 451, tariff act of 1909, and was subject to the cumulative duty imposed in the proviso of that paragraph upon gauffre leather.— United States *v.* White (2 Ct. Cust. Appls., 80; T. D. 31632).

United States Court of Customs Appeals, December 16, 1912.

Appeal from Board of United States General Appraisers, G. A. 7362 (T. D. 32505).

[Affirmed.]

*Comstock & Washburn* (*George J. Puckhafer* of counsel) for appellants.

*William L. Wemple*, Assistant Attorney General (*Charles E. McNabb*, assistant attorney, of counsel), for the United States.

Before Montgomery, Smith, Barber, De Vries, and Martin, Judges.

Martin, Judge, delivered the opinion of the court:

The merchandise involved in this case consists of certain leathers imported by appellants from Russia, and invoiced as 100 hides of light red Malja, American grain, glaze.

Duty was assessed upon the importation at 15 per cent ad valorem as calfskins tanned and dressed, and also cumulatively at 10 per cent ad valorem as gauffre leather, all under paragraph 451 of the tariff act of August 5, 1909.

---

[1] Reported in T. D. 33040 (23 Treas. Dec., 606).

The importers protested against the assessment, and contended that the leathers were dutiable at but 15 per cent ad valorem as calfskins dressed and finished, or at that rate as bookbinders' calfskins, under paragraph 451 of the act; or at the rate of 7½ per cent ad valorem as grain leather, under the provisions of paragraph 450. Various other claims were made in the protest, which need not now be specifically mentioned.

The protest was duly tried upon evidence by the Board of General Appraisers, and upon consideration was overruled. The importers now appeal to this court for a reversal of that decision.

The following is a copy of the pertinent parts of the paragraphs above cited:

450. * * * *Provided*, That on and after October first, nineteen hundred and nine, grain, buff, and split leather shall pay a duty of seven and one-half per centum ad valorem; * * *

451. * * * Dressed upper and all other leather, calfskins tanned or tanned and dressed, * * * other skins and bookbinders' calfskins, all the foregoing not specially provided for in this section, fifteen per centum ad valorem; * * * *Provided*, That leather cut into shoe uppers or vamps or other forms, suitable for conversion into manufactured articles, and gauffre leather, shall pay a duty of ten per centum ad valorem in addition to the duty imposed by this paragraph on leather of the same character from which they are cut

It is at once apparent from the record that the importation is calfskins dressed, and liable as such to the primary duty of 15 per cent ad valorem imposed by paragraph 451, and that the only question in the case is whether or not the leather is also gauffre leather, subject to the cumulative duty of 10 per cent ad valorem imposed by the concluding proviso of that paragraph. The testimony upon that issue is conflicting.

The leathers in question consist of entire calfskins, which were tanned, dressed and finished in Russia. Upon the grain side the leather has a solid red color, and its surface is broken by uniform lines of wavy depressions. These lines are not the natural grain of the leather, although they very remotely resemble that. They are artificially impressed upon the surface of the leather by some mechanical process, either by means of rollers or of dies, and give the leather an attractive and ornamental appearance. The leather is uniformly known in trade as "Russian calf, long grain," and is not commercially known in the leather trade of this country as gauffre leather. The importers undertake to prove by the testimony that there is no leather made or bought and sold in this country which is commercially known to domestic manufacturers of leather or dealers in that commodity as gauffre leather; and they furthermore undertake to prove that there is a class of leather known by commercial designation to the leather trade and bought and sold therein as embossed leather, but that the leather here in question does not come within that commercial designation. No testimony was offered by the

Government to contest the first of these two propositions, but the second proposition was directly contradicted by a number of the Government's witnesses.

Inasmuch as the record does not show any commercial usage of the word "gauffre" as applied to leather, that term as used in paragraph 451 must be understood in its common and ordinary acceptation. In looking to the approved lexicons for this meaning, the following definitions commend themselves as authoritative:

Oxford Dictionary:

*Goffer, gauffer.*—Also * * * gauffre, to stamp or impress figures on cloth, paper, etc., with tools on which the required pattern is cut; f. gaufre, honeycomb. The usual sense of the English word is in French expressed by *gauffrer a la paille*, trans. To make wavy by means of heated goffering-irons; to flute or crimp.

Standard Dictionary:

*Goffer.*—1. To form plaits or flutes in; crimp * * *. 2. To raise in relief, as leather; gauffrer, honeycomb.

Century Dictionary and Cyclopedia:

*Goffer.*—Also written gauffer; * * * crimp, * * * figure * * *. 1. To plait, flute, or crimp. 2. To raise in relief, especially for ornamental purposes, as thin metal, starched linen, or the like.

A consideration of the testimony and an inspection of the exhibits place the importation directly within the foregoing definitions as applied to leathers. The indented lines which appear upon the grain side of these leathers are stamped or impressed thereon by mechanical processes with tools on which the required pattern is cut; the figures between the depressions are raised into at least relative relief by means of the indentations thus imposed upon the processed surface; the impressed figures belong distinctively to the character to which the term "gauffre" was primarily applied; that is, they form plaits and flutes, and are crimped, corrugated, and wavy. In the absence, therefore, of any commercial limitation upon the meaning of the term, the importation is aptly and exactly described by the statutory term in question.

In the case of United States *v.* White (2 Ct. Cust. Appls., 80; T. D. 31632) this court considered the subject of gauffre leather upon an assessment made under the same provision as that applied in the present case. In that case, as in this, it was not claimed by either of the parties that the term "gauffre leather" possessed any peculiar trade or commercial signification. The leather involved in that case was concededly embossed leather, and was described in the opinion as follows:

The merchandise presents a light-gray appearance, approximating that of silver. It is concededly embossed by the use of a stamp, the impressions of which are plainly visible upon the reverse side of the merchandise, presenting raised effects upon the surface. There are added upon the surface figures in black. The appearance presented is that of a finished or ornamental leather in imitation of a lizard's skin.

The court in that case held the leather to be gauffre leather under paragraph 451 and sustained such an assessment by the collector. The court there defined the term "gauffre leather" to be substantially synonymous with embossed leather.

In the White case, above cited, the face of the imported leather was particolored, which aided in producing a lizardlike effect upon the surface, whereas no such elaborate decoration has been worked upon the surface of the present importation. But in adverting to that feature of the article then before the court it was said that "the importation consists of embossed leather to which *there has been added* colored figures for fancy effect;" and also "it has, in addition to embossing, certain figures in jet or black." The coloring of the leather was thus distinguished as a process wholly additional to the process of embossing it.

In this connection it should be observed that the statement made in the White case, that the terms "gauffre" and "embossed" as applied to leathers are substantially synonymous, was not based upon any restricted or peculiar commercial signification of either of those words; to the contrary, both terms were used and intended in their ordinary signification. Therefore, in the present case the testimony produced by the importers in proof of a commercial meaning of the term "embossed" can have no application. In the White case it was conceded that the leather involved was embossed leather, and therefore the meaning of that term was not disputed and was not made the subject of commercial testimony. The decision in that case therefore implies that the word "embossed" is substantially synonymous in its ordinary signification with the word "gauffre" as used in the act. And in this connection it may safely be said that the leathers now before the court are embossed leathers within the common acceptation and descriptive force of that term. See Stiner *v.* United States (2 Ct. Cust. Appls., 347; T. D. 32079).

It is contended by counsel for the importers that the leather involved in the White case was much more elaborately and richly decorated by the embossing process than that now before the court and that the rule laid down therein should not therefore apply to this case. In answer to this, however, it may be said that it was not the extent or quality of the embossing which determined the decision in the White case, but only the fact that the leather therein was actually embossed.

It will be observed that the present importations are whole or uncut calfskins, whereas the cumulative duty of 10 per cent ad valorem, by the terms of paragraph 451, is levied in addition to the duty already imposed by the paragraph on leather of "the same character as that from which they are cut." It is therefore con-

tended that the provision for gauffre leather can not apply to these entire calfskins, because it can not be said that they have been cut from any other leathers. This contention was considered and over-ruled in the White case, above cited, the opinion of the court upon that subject being as follows:

DE VRIES, *Judge:* * * * The use of the word "cut" in the paragraph under consideration seems inapt, unless the term be applied commercially to those strips of gauffre leather alone defined in the decisions quoted. There is no testimony upon that point in this record, and so far as this record discloses trade and commerce affixes no limitation or other definition to that term, measured by shape or size. In its descriptive force it would apply to any size or shape of leather embossed in the manner stated. We do not think, however. this use of the word as in this paragraph should be held to defeat the manifest purposes of Congress: It was undoubtedly the intention of Congress to levy upon these finished leathers, to which had been applied additional processes in order to emboss them and to give them fancy effects, an additional rate of duty to that levied upon the leathers from which they are made. The use of the word "cut" in the statute is in one sense instructive and indicates that when Congress adopted this phrase it had in view the purpose of embracing and making subject to this additional duty the gauffre leather spoken of in the court and board decisions quoted Such leathers were "cut" because they were in strips of such definite size and shape as to impress the reader that these were customary incidents of gauffre leather.

There being no evidence here that the term has other than its common and descriptive signification, which is not confined to any size or shape of leather, we must hold it descriptively applicable to these importations. That was accomplished and the additional duty levied by the use of the words "gauffre leather" alone. The remaining portion of the phrase is not used by way of description or limitation of the article upon which duty is levied, but *is a term or phrase of reference only,* indicating and pointing out the leather otherwhere in the act made dutiable, to which rate this additional rate is added. It is a term of reference and not of description. That basic provision is variable, dependent upon the proof as to what leather the particular gauffre is made from, which proof we think is fairly established in this case by the appellee's admissions in his protest.

It seems proper here to call attention to the decision of this court at the present term in the case of Spalding & Bros. *v.* United States, reported as T. D. 32910. The leather involved in that case was embellished by wavy figures similar to those upon the importations in this case, yet the court held that they were not subject to the cumulative duty imposed upon gauffre leather by the proviso to paragraph 451. A reading of that decision discloses the fact that the leather therein involved was "grain" leather, dutiable as such under paragraph 450, and that it did not belong to any of the kinds of leather named within the body of paragraph 451. Now, the proviso to paragraph 451 imposes its cumulative duty upon such gauffre leather only as is cut or made from some of the leathers already subjected to a primary duty by the body of the paragraph. Inasmuch therefore as the grain leather of the Spalding case was not dutiable primarily within the body of paragraph 451, it was held to be not

subject to the cumulative duty imposed by the proviso to that paragraph. On the other hand the leathers involved in the present case are dressed calfskins, and as such are dutiable under the body of paragraph 451; therefore the controlling factor in the Spalding decision does not apply to this case. It is this difference which results in the different classifications of the two leathers, notwithstanding the similarity of their surface embellishments.

The court therefore concludes upon the present record that the leathers herein involved are gauffre leathers both according to the approved definitions of the term and under the authority of the White case, above cited, and that they were correctly classified and assessed as such by the collector. Therefore the decision of the board sustaining the collector's assessment is approved and *affirmed*.