ABSORBO BEER PAD CO., INC. *v.* UNITED STATES (No. 4379)[1]

[1] C. A. D. 209.

United States Court of Customs and Patent Appeals, June 15, 1942

*William Whynman* for appellant.
*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks,* special attorney, of counsel), for the United States.

[Oral argument April 8, 1942, by Mr. Whynman and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellant has appealed here from a judgment of the Second Division of the United States Customs Court, one judge dissenting, which overruled appellant's protest and sustained the action of the Collector of Customs at the port of New York in assessing a duty of 30 per centum ad valorem under paragraph 1413 of the Tariff Act of 1930 upon certain pulpboard imported from Germany. The importer, in its protest, claimed the merchandise to be classifiable under paragraph 1402, the pertinent portion of which reads as follows:

PAR. 1402. * * * pulpboard, * * * not * * * embossed, printed, decorated or ornamented in any manner, * * * 10 per centum ad valorem: * * *

The pertinent portion of paragraph 1413, under which the merchandise was assessed, reads as follows:

PAR. 1413. * * * pulpboard, * * * embossed, printed, or decorated or ornamented in any manner; * * * 30 per centum ad valorem; * * *

On the invoice appears the following red-ink notation:

30% 1413 embossed both sides.

At the trial, Samuel J. Neuwirth, the examiner who examined the merchandise and placed the red-ink notation on the invoice, testified, in substance, that while he advisorily classified the merchandise as dutiable under paragraph 1413, with the statement that both sides of the pulpboard were embossed, he considered it ornamented as well; that it was not plain pulpboard.

The importer contends that the only issue presented here, as it states it was in the court below, is whether or not the imported mer-

chandise is embossed. The majority of the trial court held that the merchandise was both embossed and also ornamented and decorated. The dissenting judge took the position that the only question before the court was whether the imported merchandise was embossed, and that in his opinion it was not embossed.

The importer, in urging that the sole question for this court to decide is whether or not the involved merchandise is embossed, relies upon the case of *United States* v. *White Sulphur Springs Co.*, 21 C. C. P. A. (Customs) 203, T. D. 46728. That case supports the proposition that if the assessment was made upon the theory that the imported merchandise was embossed, there was no presumption of correctness attaching to the provision regarding decoration or ornamentation. We are of the opinion that the collector's classification was based upon the conclusion that the board was embossed. This, however, does not negative the fact that embossing is a form of decoration or ornamentation; and the indorsement in red ink by the examiner is not necessarily a holding that the merchandise is not decorated or ornamented. Not all decoration or ornamentation is made by the process of embossing, but all embossing amounts to decoration or ornamentation. Ofttimes, embossed articles are further decorated or ornamented—colors are frequently added, and other embellishments may be superimposed.

The importer offered the testimony of eight witnesses for the purpose of proving that the involved merchandise was neither embossed, nor decorated or ornamented, although, as before stated, its counsel emphasized the proposition that it was not necessary to prove that the merchandise was not decorated or ornamented. The burden was on the importer to prove that the classification of the collector was wrong and that the collector erroneously assessed the merchandise with a duty of 30 per centum ad valorem. While we agree with the importer that if the examiner's advisory classification is to be construed as the importer contends it should be there was no presumption of correctness attaching thereto that the merchandise was decorated or ornamented, it nevertheless was the duty of the importer to show that the merchandise was not decorated or ornamented. In view of our conclusion, based largely upon our view as to the potency of the evidenciary value of the representative sample of the merchandise, it is not necessary here to pass upon the question of the difference between the character of proof required in the present circumstance and that which would be required had the examiner expressly returned the merchandise as "decorated or ornamented" as well as "embossed."

At this point it becomes important to describe the involved pulpboard, the process of its manufacture, and other related facts which may have some bearing on the issues hereafter to be decided.

The appellant, importer, is the manufacturer of so-called beer pads or beer coasters used in places where glasses or steins of beer are served. The coasters absorb beer or dampness from the outside of the glasses and thereby prevent the same from coming into contact with the tables, bars, etc. The coasters are round discs cut from the imported sheets and are slightly over 4 inches in diameter. Ordinarily, the importer embosses or prints on the coasters advertisements relating to the beer used, or other decorative or ornamental effects, ofttimes in colors.

A sample of the imported merchandise, Exhibit 1, consists of a piece of pulpboard approximately 18 inches long, 14 inches wide, and ⅛ inch thick. Upon close examination, it appears that each side thereof has a slightly scarred or roughened surface caused by very minute depressions made therein in the process of manufacture, which depressions occur at regular intervals, constituting what might be termed straight lines of depressions. At a distance, the board appears to be plain. The record shows that the instant board is referred to as "pin-pricked," i. e., the indentations are similar in appearance to those which would be made by numerous pinpricks.

Samples of so-called plain board were also introduced in evidence, as well as samples of boards which have a somewhat roughened surface caused by slighly depressed lines traversing the same, said to be impressions made thereon by the felt belt or web which carried the wet pulp to the rollers. The latter exhibit presumably is made in this country, and it is not urged by anyone that this kind of material is embossed, decorated, or ornamented.

The process of manufacture of the imported pulpboard in Saxony, Germany, is set set out in the testimony of the witness Leo Weiss, who observed the manufacturing operation in the foreign country. This testimony was summarized in the majority opinion with sufficient fullness and accuracy, we think, to justify setting it out here (omitting record numerals):

Plaintiff called as one of its witnesses, Leo Weiss, who stated through an interpreter that he was in this country only 6 weeks, and that he came from Vienna; that he was a buyer of pulpboard like exhibit 1 for 7 years in Czechoslovakia, Austria, and Germany, and visited the various factories, including that of Plattenthal Papier-Fabricke, the manufacturers of the pulpboard in the present case, and saw the process by which it was made. He stated large pieces of wood are first made into smaller pieces, and then washed and granulated between two stones in large vats of water. The mass is then allowed to flow out into a large vat and pumped upstairs, and there it goes on a machine. That machine has a large ribbonlike band made out of cloth. The material runs on that band, and there is a second band that only allows a certain amount of the mass to pass through between the two bands. After that it goes through steel rollers which are set according to the thickness that is desired. From there it goes immediately to the drying chamber, after which it is cut, weighed, and packed. Also that the machines used are very expensive.

On cross-examination the witness admitted that the pulp stock first goes on to a wire screen that has holes in it, that the water runs off while the pulp stock is on the wire screen, and that the marks that appear on exhibit 1 are made by the use of such wire screen. * * *

Appellant has assigned error directed to the action of the trial court in permitting the incorporation of the record in another case, *Absorbo Beer Pad Co., Inc.* v. *United States*, T. D. 49112, 72 Treas. Dec. 219, upon the theory that the other case involved goods imported from another country, made by another manufacturer and by a somewhat different process. The incorporated record related to so-called pin-pricked pulpboard, and the issues in that case involved the main issues in this case, i. e., whether or not the pin-pricked pulpboard there was embossed, decorated, or ornamented. While some phases of the testimony in that case might not be relevant in deciding the questions presented here, we think the trial court was clearly within its discretion in permitting the incorporation of said record. It, of course, would take into consideration the circumstances to which appellant alludes.

There is considerable controversy between the parties regarding the weight to be given to the testimony of the eight witnesses for the importer and the two witnesses for the government. Likewise, the views of the majority and the minority of the trial court differ over this question. However, in view of our conclusion, it is unnecessary to detail the testimony here.

Briefly stated, the importer attempted to prove by certain witnesses that the involved pulpboard did not respond to the term "embossed" and that it was not decorated or ornamented. Some of these witnesses testified that they had had experience in manufacturing and selling paper board and pulpboard, ornamented, unornamented, and printed, and were of the opinion that the instant merchandise was plain. They said that they would not sell the same as decorated, printed, or ornamented, or embossed pulpboard, and that it would not be a good delivery for any of those types of board. One witness pointed out (which we regard as irrelevant) that the instant board was not of the best quality because it contained shives—pieces of raw wood not properly ground or dissolved. A commercial artist testified that the so-called design on the instant merchandise did not form a design responding to the term "embossed" and that the merchandise, in his view, was not decorated, ornamented, printed, or embossed. Examiner Samuel J. Neuwirth testified to the effect that the board would be plain board if it was in the condition in which it came off the machine with no further processing applied to it.

The government later introduced further testimony by Mr. Neuwirth in which he stated that the surface of the pulpboard resembled pin pricks, although one side was not so pronounced as the other.

He testified that it was embossed, decorated, and ornamented. The second witness for the government had little, if any, knowledge relating to the manufacture of pulpboard and was not permitted to express any definite views as to the character of the involved merchandise.

The majority of the trial court, in commenting on the evidence introduced in the instant case, stated that it was "rather irrelevant and without much, if any, weight." On this subject we quote the following portion of the majority opinion:

The government then called as a witness Ely O. Merchant, who testified that he is secretary and treasurer of the Groundwood Paper Manufacturers' Association, which is composed of mills manufacturing various grades of paper. He stated his business was not connected with pulpboard, but that he is familiar with the manufacture of the paper of the various mills represented by the association; that he has also seen paper board and pulpboard manufactured. He stated that his eyesight was "pretty fair, I guess," and was asked to look at exhibit 1 and say whether he saw anything on the surface, and also to describe the surface to the court. An objection was interposed by counsel for the plaintiff to said question, as follows:

Mr. WHYNMAN. I object to the question. First off, he [the witness] is called as a layman and asked to describe what he sees. The court can see for itself, and he may see *see* things entirely different from the court, and that would not help the court any; would not be controlling. I think the question is improper at the moment.

We think the foregoing objection might apply with equal propriety to most of the testimony introduced by plaintiff's witnesses, in view of past decisions of the courts to the effect that whether an article is or is not "embossed," "figured" "decorated," or "ornamented," etc., is to be determined by its appearance to the eye, rather than by the method of producing such effects or by the intention of the manufacturer, and, further, in view of the fact that such terms have been considered descriptive rather than a matter of commercial designation.

The view of the dissenting judge was, contrary to that of the majority, to the effect that the record in the incorporated case (in the decision of which he joined) was different from that in the present case in that the instant record shows a different process of manufacture from that employed in the incorporated case. According to the minority opinion, the proof in the instant case supports the contention of the importer that the involved pulpboard is not embossed. In emphasizing the importance of the testimony in the instant record, the minority judge stated:

I am not unmindful of the authorities holding samples to be potent witnesses, nor do I overlook the decisions hereinbefore referred to holding that "whether a cloth is figured or not is judged by its appearance to the eye," but for the reasons heretofore set out, I do not feel this is a proper case for the application of those principles to the exclusion of any consideration of the testimony submitted. * * *

\*      \*      \*      \*      \*      \*      \*

I see little, if any, difference in determining from an examination of the sample alone whether or not certain stitching on merchandise is "straight hemstitching," and determining from an examination of the sample whether or not pulpboard is "embossed." Indeed if such testimony is not to be considered under any

circumstances, then why should the witnesses be permitted to give such testimony to the extent of 172 typewritten pages? I fully recognize the fact that such testimony is not binding upon the court, but I also recognize the fact, as has the appellate court, that there are situations in which it is proper to look to it in connection with the merchandise itself and in connection with lexicographers and technical authorities.  *  *  *

We have set out the views of the members of the trial court in order that the contentions of the parties here and the real issue presented in this case may be better understood. If the weight of opinion evidence on the question as to whether or not the imported merchandise was embossed, or decorated or ornamented in any manner, were to be controlling in the instant case, we think it clear that the judgment of the trial court should be reversed on the ground that it is contrary to the weight of evidence. However, it has long been recognized that to determine the common meaning of words such as "embossed," "ornamented," and "decorated," the court may, in its discretion, receive the testimony of competent, experienced witnesses and give the testimony such weight as it seems entitled to. It is too well settled to require the citation of any supporting authority that the court is not bound by the testimony of witnesses relating to the common meaning of terms. There is no contention here that any of the words the meanings of which are in dispute have commercial meanings differing from their common meanings. The meaning of a word may be ascertained with perfect propriety by the judge called upon to determine such meaning, by examining the lexicographical and technical authorities, and he may seek aid from the testimony of competent witnesses.

In the present situation it seems to us that, having arrived at the meanings of the disputed terms, the court, in the absence of an issue involving commercial meanings, can examine the merchandise and apply to it the meanings of the disputed terms as properly as can witnesses who purport to express their views on the subject. It is not proper to say that the testimony of witnesses on the common meanings shall be given no consideration. It is sufficient to say that such testimony is not binding on the court and, in the present instance is not very helpful in determining the particular questions involved.

Some of the witnesses stated that the pin-pricked board was not embossed; that "embossed," according to the dictionaries, meant embellished by a raised surface or a depressed surface; and that the instant merchandise had a "blurred" effect and not an embossed effect. The trial judges, and we of course, after knowing what "embossed," "decorated," and "ornamented" mean, are as capable of determining whether the instant merchandise is embossed, decorated, or ornamented as any witness with normal vision.

It is clear that Congress intended, by the enactment of the pulp-board provisions, *supra*, to segregate the classification of plain pulp-board from that of pulpboard which had "undergone special processes of manufacture." See the Summary of Tariff Information, 1921, page 1050. For plain pulpboard, it provided a rate of duty of 10 per centum ad valorem; and for pulpboard which had been more highly processed by being embossed, decorated, or ornamented in any manner, a rate of 30 per centum ad valorem. The determination of whether or not the instant pulpboard should be held dutiable as embossed, decorated, or ornamented board is a close question if the technical definitions of the terms are strictly adhered to. Here we will quote the dictionary definitions relied upon by the majority of the trial tribunal (all from Webster's New International Dictionary, 1936):

emboss v. t. 2. To raise the surface of into bosses or protuberances, esp. by pressure against a steel roller cut or engraved with a pattern; to ornament with raised work. 3. To raise in relief from the surface, as an ornament, a head on a coin, type or a device on a letterhead, or the like. Embossed work is done by mechanical means, as by embossing dies; repoussé work is done with hand tools, as embossers. 4. Hence, to adorn or embellish with rich ornamentation.

decorate v. t. b. To increase in beauty by the addition of something becoming or beautiful; to embellish; as, to decorate a palace wall, a grave, a pediment. 2. To set off by ornamental accessories; to deck with striking, and often incongruous, additions;

decoration n. 2. That which adorns, enriches, or beautifies; embellishment; ornament.

decorative adj. 1. Tending to decorate; pertaining to decoration; as: (a) Having a purely ornamental function. (b) suitable for decorating or embellishing; enhancing in attractiveness. 2. Aesthetics. Designed and executed to decorate rather than to represent; pleasing or intended to please by harmonious adaptation of pattern, line, color, rhythm, etc., to imposed restrictions, such as space, position, length, etc.

ornament v. t. To provide with ornament; decorate; embellish; as, to ornament a room, or a city.

fancy adj. 2. Adapted to please the fancy or taste; ornamental;—opposed to plain; as, fancy goods.

We also quote from The Dictionary of Paper, Exhibit 2 in this case, the definition of the terms "embossed" and "embossed board" relied upon in part by the dissenting judge below:

Embossed—A term applied to paper on which a raised or depressed design is pressed by passing the paper between an engraved steel roll or plate and another roll or plate of soft or compressible material, such as paper or cotton, or by pressure between strong coarse fabrics. The operation is used for decorative effects and is generally applied to book, blotting, cover, and wallpapers.

Embossed board—A general term for any board that has been passed through metal rollers upon which a design has been cut. The rollers may simply impress the design or they may be inked to add color to the pattern.

This court, in *Stiner & Son and Bischoff & Co.* v. *United States*, 2 Ct. Cust. Appls. 347, T. D. 32079, on the subject of embossing, said:

\* \* \* Embossing implies not only a perceptibly raised surface but a raised surface which is distinctively and perceptibly a form, figure, or design. On the other hand, the surface of an embossed form, figure, or design need not be raised above the general surface of the article. It is enough if it be raised above the surface which immediately surrounds it. Neither does embossing necessarily require that the relief effect shall be directly produced by a die appropriate for the purpose. A die for the making of intaglios may be so used as to develop not only intaglio forms, figures, and designs but corresponding forms, figures, and designs the surface of which is in relief.

As suggested by counsel for the importer, any embossed effect in the cards here under consideration may be purely incidental to the production of the gold effects and may have been wholly beyond the intention of the manufacturers to produce. Nevertheless, if an embossed effect has been produced the fact that it exists and not the intention of the manufacturers must control classification.

In the instant case the pin-pricks are not shown to be the result of any operation intended solely for the purpose of embellishing the article, but the pin-prick effect is brought about by the fact that a wire-mesh screen is used to carry the pulp mass and permit drainage therethrough. However, it is observed from the foregoing quotation from a decision of this court that if a decorative or ornamental or embossed effect is imparted, the intention of the manufacturer is not a matter of concern. Of course, if the process is intentional, it would seem to follow that the manufacturer's action speaks loudly as to whether or not he regards his product as embellished in some manner. Nevertheless, the fact, if it be a fact, that the pin-pricking process was not carried out with the intention of embellishment makes but little difference in determining the issue involved.

It.is our view that the so-called blurred effect given to the surface of the boards at bar, which effect can be observed only by close inspection, cannot properly be regarded as an ornamentation or decoration, or as embossing, within the meaning of the provisions of paragraph 1413. Just here, the query is pertinent: why should Congress wish to place three times as much duty upon this board as upon a board that, in the state of soft pulp, had been carried to the rollers on a felt belt instead of a wire belt? It is well settled that higher rates of duty are ordinarily imposed on goods which have been highly processed than upon plain goods or goods on which no great manufacturing effort has been expended. *United States* v. *O. M. Baxter (Inc.)*, 16 Ct. Cust. Appls. 257, T. D. 42868. The reason for this rule, of course, is obvious. The advanced processes of manufacture of a given article require much labor, ofttimes much hand labor. Congress usually evidences a desire to encourage such manufacturing processes and labor to be applied in this country, for reasons which need no further explanation here.

In the instant case the importer takes the merchandise, as imported, and according to the record, prints or ornaments or decorates the same. We think the processes which Congress had in mind in the enactment of paragraph 1413 involve greater embellishment than characterizes the instant merchandise. It is clear to us that while the instant merchandise may be said, in one sense, to have been given raised or depressed effects, the process has not resulted in such embossing or decoration or ornamentation as Congress had in mind. No additional labor was required and, as far as this record shows, no more elaborate processing took place in the manufacture of the instant board than if it had a plain surface. Therefore, the reason which would ordinarily be attributed to Congress for providing a higher rate of duty for highly processed board than for plain board does not maintain in the present instance.

We think an anomalous result would follow from assessing the instant merchandise with a 30 per centum ad valorem duty and assessing what the Government regards as plain pulpboard with a 10 per centum ad valorem duty. We find ourselves very much in the position of this court in deciding the *Spencer Importing & Trading Co.* v. *United States* case, 2 Ct. Cust. Appls. 444, T. D. 32201, in which a similarly anomalous situation was presented. In the opinion written by Judge Martin it was stated:

The obvious unreasonableness of such a result constitutes of itself the most cogent argument against its adoption. The present case becomes a concrete illustration of this statement.

Under the circumstances enumerated hereinbefore it seems illogical in construing the meaning of the controverted tariff paragraphs to adhere so strictly to the technical letter of the lexicographical authorities as to bring about the result urged by the government and sustained by the trial court. From any observation of the instant imported goods, close or casual, it does not appear to the eye of the observer that the pulpboard has been either embossed, or decorated or ornamented, in the sense in which Congress obviously employed those terms.

Nearly a half century ago, District Judge Wheeler, in wrestling with a problem which has frequently confronted this court in its jurisdiction over customs matters, a problem relating to determining whether certain toy musical instruments should be classified as musical instruments or as toys, made an apt statement which has often been quoted since that time. See *Borgfeldt* v. *United States,* 124 Fed. 473. Referring to the allegation that the toys were musical instruments, he said, page 475:

They do not rise to the dignity of musical instruments.

**34**

It is clear to us that even with the alleged embellishment on the imported pulpboard, this merchandise does not "rise to the dignity of" embossed goods, and that it is not decorated or ornamented within the meaning of the terms employed by Congress. The roughened effect occasioned by the process of manufacture may be regarded by some as detracting from the appearance of the board; by others, the same effect may be regarded as adding to the attractiveness of the board. In all the circumstances of this case, we think we would not be justified in holding that the imported merchandise responds to any of the terms "embossed," "decorated," or "ornamented."

We have examined the decisions relied upon by the trial court and by the government, particularly *Stiner & Son and Bischoff & Co.* v. *United States, supra,* and *United States* v. *Meyerson,* 2 Ct. Cust. Appls. 225, T. D. 31953, and find them no ground for sustaining the collector's classification. In the former case, the colored pictures and figures on the imported postcards had a particular design made by running the cards through a press and over a stamp or plate bearing a pattern or design in relief. In the *Meyerson* case the imitation grain leather cardboard had been passed between a smooth roller and an indented roller. There is no such showing in the instant case.

The case of *Mills & Gibb Corporation* v. *United States,* 14 Ct. Cust. Appls. 197, T. D. 41703, relied upon by the government, is authority only for the proposition that whether a thing is figured is to be determined by the eye and that a plainly disclosed stripe is a figure and that cloth is woven-figured if the figure is made by weaving.

On the question of embossing, we think that *United States* v. *White,* 2 Ct. Cust. Appls. 80, T. D. 31632, lends support to our conclusion here, especially the following language quoted therefrom:

\* \* \* It was undoubtedly the intention of Congress to levy upon these finished leathers, to which had been applied additional processes in order to emboss them and to give them fancy effects, an additional rate of duty to that levied upon the leathers from which they are made. \* \* \*

So, also, we think the reasoning in *United States* v. *Brown & Co.,* 5 Ct. Cust. Appls. 212, T. D. 34380, is applicable. In that case it was stated:

\* \* \* within common acceptation, the term "embossed leathers" applies to a different class, namely, those which are ornamented with raised figures or figures in relief. \* \* \* It may, indeed, be claimed that the slightly depressed lines which are traced upon the surface of diced leather serve to bring the inclosed squares into relative prominence, and thus give them the appearance and effect of raised figures. This, however, in the case of the present merchandise is theoretical rather than actual, and it is hardly fitting that the assessment of the merchandise should depend upon so nominal a consideration, for in point of fact the present article does not present the appearance of raised figures or figures in relief upon its surface, nor has it been subjected to the processes commonly used for that result. \* \* \*

For reasons above set out, we are of opinion that the claim of the importer under paragraph 1402 should have been sustained. Accordingly, the judgment of the Customs Court is *reversed* and the case *remanded*.